369 So.2d 1286 (1979)
STATE of Louisiana
v.
Johnny Lee COLEMAN.
No. 61936.
Supreme Court of Louisiana.
April 9, 1979.
*1287 Ben F. Day, John Samaha, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., John W. Sinquefield, Asst. Dist. Atty., for plaintiff-appellee.
CALOGERO, Justice.[*]
This appeal, from three aggravated rape convictions and a conviction of forcible rape, all pursuant to a single jury trial, raises serious issues regarding proper joinder of offenses, denial of severance, and the admissibility of defendant's confessions. The East Baton Rouge Parish Grand Jury returned a six count indictment against defendant Johnny Lee Coleman wherein it charged five aggravated rapes and the first degree murder of the rape victim named in the fifth count of the indictment. Various defense motions to quash the indictment and sever the counts charged therein were unavailing and all six counts were tried in a single trial proceeding to one jury. Coleman was found guilty of the aggravated rapes charged in Counts one, two and four of the indictment and guilty of forcible rape on Count three. The jury was unable to reach a verdict on the fifth and sixth counts (the aggravated rape and first degree murder of the fifth victim); hence, mistrials were declared in connection with these counts. The defendant was sentenced to fifty years' imprisonment on each of Counts one, two and four, and twenty years' imprisonment on Count three, all of the four prison terms to run consecutively. Ten assignments of error are argued upon this appeal. These assignments present two basic arguments in support of reversal of the convictions and sentences.
The first argument deals with the claims of improper joinder and denial of severance. It requires that we briefly outline some of the factual details of the crimes. The rapes charged in Counts one through four of the indictment occurred within a one month time period and within a two mile radius of the Louisiana State University campus. The rape-murder charged in Counts five and six took place on the Louisiana State University campus, on the fourth floor of a women's dormitory, five months before the first of the four rapes charged in the preceding counts of the indictment. All of the crimes charged in the indictment took place during the early morning hours. In each instance referred to in the indictment's first four counts, the perpetrator menacingly admonished his victim (in Counts one, two and four there were, additionally, threats to kill). In each of the rape incidents charged in the first four counts, the attacker demanded money and injured his victim, at least slightly, apart from the sexual attack. In all of the incidents charged in the indictment's first four counts the rapist referred to the women as "bitches". Additional similarities existed between or among some, but not all, of the first four counts: in counts one, two and three the defendant demanded food; in counts one, two and four, he ransacked the apartments he entered; in counts one, two and three he was barefooted; in counts one and four he tried on shoes present in the apartments; in counts one and four he asked about car ownership; in counts one and three he asked his victims whether they derived pleasure from the sexual acts; and in counts one, two and four he ripped out the phone connections. In the case of the rapemurder *1288 charged in counts five and six, it was established that the room in which the rape and murder took place was largely undisturbed and exhibited no signs of ransacking or a struggle.
Prior to trial, the defense filed a motion to quash the indictment, urging improper and prejudicial joinder of offenses. The defense also filed a motion for severance prior to trial, which motion was re-urged numerous times during trial, prior to the presentation of evidence of each successive count charged in the indictment.
Code of Criminal Procedure Article 493 governs the joinder of offenses by providing as follows:
"Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial."
The joinder of the six offenses with which Coleman was charged did not violate the provisions of the code article. The first five counts all charge aggravated rapes, offenses which are plainly "of the same or similar character". The first degree murder was contemporaneous with the rape charged in count five and therefore formed a part of the "same act or transaction" as relates to that offense. Thus, all six offenses could properly be joined in a single indictment. State v. Nelson, 357 So.2d 1100 (La.1978).
We next consider the rulings denying the requested severance of offenses. Code of Criminal Procedure Article 495.1 sets forth the basis upon which a trial judge is required to grant a severance of offenses charged in a single indictment or bill of information. It provides:
"The court, on application of the prosecuting attorney, or on application of the defendant shall grant a severance of offenses whenever:
(a) if before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or
(b) if during the trial upon consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The Court shall consider whether, in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense."
To determine the necessity of granting the severance sought by a defense motion, the trial court must decide whether, in view of the number of the offenses charged and the complexity of the evidence, the fact finder could distinguish the evidence and apply the law intelligently to the offense charged in each count. State v. Proctor, 354 So.2d 488 (La.1977). Another issue which the trial court must resolve in view of joinder based on the relationship of the offenses because they are of the "same or similar character" is whether each offense would be admissible as similar acts within the contemplation of R.S. 15:445 and 446. Under our holding in State v. Carter, 352 So.2d 607 (La.1977) a determination that multiple counts charging offenses of the same or similar character may be simultaneously tried ordinarily requires that the counts be mutually admissible as legitimate "other crimes" evidence under State v. Prieur, 277 So.2d 126 (La.1973).[1]
Because we conclude that the rapemurder incident charged in Counts five and six of the indictment was not sufficiently similar to the rapes charged in Counts one *1289 through four[2] to warrant simultaneous trial, which will be discussed at some length hereinbelow, we need not decide whether the number of crimes charged or the complexity of the evidence would require a severance to facilitate a fair trial in connection with each offense. Nevertheless, we do entertain some doubts regarding these factors, notwithstanding the state's diligent effort to compartmentalize the evidence connected with each offense, because even in cases such as this, where the elements of the crimes are few and all but one of the crimes being tried were the same type of criminal offense, calling for the application of the identical law, there exists inherent difficulty in sifting through eight days of testimony dealing with five separate criminal transactions. However, as just indicated, our decision that severance was required in order to afford defendant a fair trial is based upon the lack of demonstrated similarity between the criminal transaction resulting in Counts five and six and those upon which the rape charges of Counts one through four are based. The aggravated rape-murder charged in Counts five and six was committed in February of 1976, five months before the first of the other four aggravated rapes (these other four were committed within a month's time period). The elements of the February rape argued to be common to some or all of the four rapes committed in July and August, entry through a window (this was the mode of entry in Counts three and four), seizure of the victim and admonition not to scream (these factors are alleged to have been revealed from the contents of defendant's confession to the rape-murder), general geographic location, the violence of the sexual assault and resulting or related injuries and the commission during the hours between midnight and dawn are common to such a large number of rapes that we are unwilling to find the substantial similarity necessary to render Counts five and six triable with the first four counts over the defense objection and motion for severance. Because we have decided that the rape-murder charged in Counts five and six of the indictment was not shown to have been sufficiently similar to the incidents during which the rapes charged in Counts one through four took place, there is no need to determine whether in this instance the evidence of each of the "other offenses" was relevant to an actual issue in each case, or whether the evidence of the "other offenses" was more probative than prejudicial. See State v. Carter, supra.
By its strenuous urging that the Court consider that State v. Carter, supra, had not been decided at the time that the trial court ruled upon the severance motions in this case, the state has effectively raised the issue of whether Carter should apply to cases tried before that decision was rendered. The applicability of the interpretation of Article 495.1 set forth in Carter to trials conducted before its effective date depends on whether the rule goes to the integrity of the fact-finding process. See State v. King, 347 So.2d 1108 (La.1977).
The holding of Carter makes the propriety of joint trials of crimes jointly charged on the basis of their identical or similar character largely dependent on whether each crime would be admissible in the trial of others, applying Prieur standards. Carter's rationale clearly demonstrates that the rule directly relates to the accuracy of the verdict. The Court best articulated this view in State v. Hamilton, 364 So.2d 585 (La.1978) when it stated as follows:
"In interpreting the statutory command that the trial court shall grant a severance whenever it will promote a fair trial, this Court in State v. Carter, 352 So.2d 607, 614 (La.1977) held that normally a joint trial of several offenses will not promote a fair trial if the defendant will *1290 be prejudiced by the introduction of evidence of other offenses which the rules of evidence would exclude in the interest of a fair trial if the offenses were tried separately."
Without squarely addressing the issue, the Court has heretofore applied the Carter rule to cases in which the trial was conducted prior to the effective date of Carter. See, e. g., State v. Lewis, 358 So.2d 1285 (La. 1978) and State v. Mitchell, 356 So.2d 974 (La.1978). The mere fact that Carter had not been decided when the motions for severance were considered in this case does not alter the fact that denial of severance was legally incorrect.
Moreover, the error of the trial court cannot be viewed as harmless. The state's "harmless error" argument in State v. Hamilton, supra, made on the basis of the victims' unequivocal identifications of the defendant as perpetrator of the crimes as to which guilty verdicts were returned was rejected by this Court, which noted:
"This [harmless error] argument is difficult to consider as having been made seriously because it ignores a basic constitutional limitation upon this Court's appellate jurisdiction. `In criminal matters, its appellate jurisdiction extends only to questions of law.' La.Const.1974, Art. 5, § 5(C). . . . Because we have no way of knowing whether separate juries would have reached the same results in separate trials, and because in criminal appeals we are prohibited from reviewing the evidence and making a factual determination, we cannot declare that the failure to sever the offenses was harmless or inconsequential to the actual or a just outcome of the prosecutions against the defendant."
The same rationale applies in this case, where the victims of Counts one through four likewise made unequivocal identifications of Coleman.
For all of the reasons aforestated, the trial court's error in refusing to sever the trial of Counts five and six from that of Counts one through four requires reversal of the convictions and sentences we here review.
Having found error mandating reversal of defendant's convictions and sentences in the trial court's denial of severance we need rest our determination to reverse defendant's convictions and sentences on no other error. However, we address defendant's assignments regarding his confessions in order to assure that in any subsequent trial of the offenses which were the subject of the trial we review, the scope and extent of the state's burden of proof will be clearly understood. The defendant's second major argument urges that the trial court erred in refusing to listen to the substance of defendant's various taped confessions before ruling on admissibility and in denying the motion to suppress the confessions. The record reveals that numerous statements were taken from the defendant over a three week period of time. One of the two officers primarily involved in the interrogation of Coleman testified that the total interrogation time exceeded ten hours. In a motion seeking the appointment of a sanity commission defendant sought to have that body determine his mental condition at the time of interrogation and confession. Testifying at the motion to suppress the confessions, one of the doctors appointed, Dr. Steele, set forth that he considered the issue of Coleman's sanity at the time of the confessions but reached no conclusion in that regard. On the issue of present sanity and sanity at the time of the offenses, he testified that he found Coleman psychotic, with a history compatible with long standing serious psychiatric disorder of a psychotic type and opined that Coleman was probably psychotic at the times of the commission of the offenses, probably psychotic for the previous two years. He testified that there is some correlation between psychosis and inability to distinguish right from wrong. Examination of Dr. Steele concluded with questioning concerning his diagnosis of Coleman in the sanity commission report, a diagnosis of paranoid schizophrenia of the hostile subtype.
Dr. Silva, the second member of the sanity commission appointed by the court, verified *1291 that his examination focused on Coleman's mental state at the time of the confessions as well as his present sanity and sanity at the time of the confessions as well as his present sanity and sanity at the time of the offenses. Dr. Silva characterized Coleman as mildly to moderately retarded, not overly psychotic but tending toward paranoid thinking. Asked if Coleman's condition affected his capacity to understand abstract concepts such as one's right to remain silent, or one's right to the presence of any attorney prior to making any statements, and questioned about the inability of a person of Coleman's type to comprehend the depth and magnitude of these rights while nevertheless acknowledging understanding, Dr. Silva responded:
"Well, in the particular case of this particular person, this is also aggravated by the fact that he is a skillful manipulator. . . [who] will tend to ingratiate with people . . . think[ing] that he might be able to manipulate somebody [thereby]. . . . He might do something to kind of buy off this person, without really realizing in what deep water they are getting."
Ascertaining that Dr. Silva had listened to the tape of a confession given by Coleman, the defense elicited testimony that Coleman, in the doctor's opinion, could not appreciate the depth and magnitude of the rights he was heard to waive on the tape. The doctor opined that Coleman understood the words, but that he was incapable of understanding the crucial rights he waived. Dr. Silva unequivocally asserted his opinion that Coleman did not knowingly and intelligently waive his Miranda rights when he confessed on the tape to which the doctor listened.
After the two doctors testified at the suppression hearing, the defense presented the testimony of a PhD in Psychology, the director of testing at Southern University, who administered numerous tests to Coleman. Apparently using the same test results upon which Dr. Silva based (in part) his conclusion that Coleman was mildly to moderately retarded, this psychologist, Bradley, characterized Coleman as severely retarded. Asked if he considered the defendant capable of appreciating the significance of the rights he heard Coleman waive on a tape of a confession defendant made, Bradley opined that Coleman would not have any knowledge of the import of waiving his Miranda rights.
The two officers primarily involved in the interrogation of Coleman, who secured from him the confessions sought to be suppressed, testified that there were no threats or promises made to Coleman to induce his confessions. Officer Gill testified that Coleman impressed him as mentally "sharper" than the average person he arrested during the year and felt that he actually had the tenth grade education he claimed. Officer Dupuy indicated by his testimony that Coleman seemed "very" intelligent to him, "more than some."
Contrary to the state's strenuous argument at the close of the hearing on the motion to suppress Coleman's statements, the state, not the defense, has the burden of establishing beyond a reasonable doubt that the confessions were made freely and voluntarily. State v. Weinberg, 364 So.2d 964 (La.1978). Where insanity is an issue, in the context of a proceeding to determine the voluntariness of a confession, (and, thus, its admissibility) the state must prove that the defendant's mental defect did not preclude the voluntary giving of a confession. State v. Trudell, 350 So.2d 658 (La. 1977).
Substantial doubts regarding Coleman's ability to freely and voluntarily waive his privilege against self-incrimination and consequently give a confession of his own free will are engendered by the testimony of the two appointed sanity commission doctors and the psychologist testifying on defendant's behalf. Notwithstanding the fact that we accord such great weight to the trial judge's determination on the issue of the state's satisfaction of its burden of proof, that determination is not to be upheld when it is unsupported by the evidence. See State v. Rankin, 357 So.2d 803 (La.1978). In ruling adversely to the *1292 defendant on the motion to suppress the confessions, the judge stated that:
". . . when you get right down to it. . . the testimony of the defendant himself, the court feels that he knows what he is doing. He knew what he was doing, the evidence is clear on that by his own testimony. His testimony really convinces the court in connection with the other testimony that the confessions were free and voluntary. . . . "
Careful examination of the testimony of the defendant Coleman corroborates that of the officers that there were no threats, promises, or other inducements made to procure the confessions. Nevertheless, the asserted errors raise serious issues, considering the substantial defense evidence otherwise tending to prove that Coleman's confessions were not freely and voluntarily given. In State v. Volk, 369 So.2d 128 (La.1979), we quoted from State in the Interest of Dino, 359 So.2d 586, 591 (La.1978) language gleaned from Miranda v. Arizona, 384 U.S. 436, 469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to the effect that in determining voluntariness the court must consider whether the accused who is confessing is "` . . . aware not only of his rights, but also of the consequences of foregoing them . . . .'" The members of the sanity commission appointed by the court and the psychologist who tested Coleman to determine his mental capacity gave testimony wholly at odds with a conclusion that Coleman was capable of (and did have) an awareness of the consequence of foregoing his rights. The question of whether the testimony of the two officers and Coleman sufficiently supports such a conclusion to the extent that a determination of voluntariness could be based upon it is a serious one. Furthermore, it would have been preferable had the trial judge acceded to the defense request that he listen to the content of the taped confessions as well as to the initial portions containing the waiver of rights. This review would have enabled him to consider evidence from the defendant's own mouth produced at the actual time the confessions were made as well as the defendant's hearing testimony given five months after the confessions were obtained. Because of the deficiencies we perceive in connection with the admissibility ruling, we find it advisable, even though reversing the convictions on another ground, to set aside that ruling at this time. This action requires that the admissibility issue be determined anew, in light of the views expressed herein, the evidence previously adduced and such other evidence as the state or defendant may introduce, in the event that Coleman is retried for one or more of these crimes.

Decree
For the reasons assigned, the defendant's convictions and sentences are reversed and the case remanded for re-trial.
REVERSED AND REMANDED.
SUMMERS, C. J., and CULPEPPER and MARCUS, JJ., dissent.
NOTES
[*] Chief Judge William A. Culpepper participated in this decision as Associate Justice Ad Hoc sitting in the place of Chief Justice Sanders, retired.
[1] State v. Carter, supra, requires that for offenses to be legitimate "other crimes" within the contemplation of the Prieur line of cases, the offenses must be sufficiently similar, the evidence of the "other crime" must be relevant to a real issue, and the prejudicial effect must not outweigh the probative value.
[2] As may be inferred from our outline of the factual details of the offenses earlier in the opinion, we are unimpressed with a zealous defense argument that the rape charged in Count three varied in so many particulars from those charged in Counts one, two and four that it is not a similar act within the contemplation of R.S. 15:446 and the jurisprudence interpreting that statute.