536 So.2d 481 (1988)
STATE of Louisiana
v.
Carol GOLMON[1].
No. 88 KA 0345.
Court of Appeal of Louisiana, First Circuit.
November 22, 1988.
*483 Bryan Bush, Dist. Atty., Baton Rouge, by Joe Lotwick, Asst. Dist. Atty., for plaintiff/appellee.
Office of the Public Defender, Baton Rouge, for defendant/appellant.
Before EDWARDS, SHORTESS and SAVOIE, JJ.
SHORTESS, Judge.
Carol Golmon (defendant) was indicted by the East Baton Rouge Parish Grand Jury, with second degree murder. LSA-R. S. 14:30.1. Defendant pled not guilty and filed motions to suppress a confession and physical evidence, which were denied after a hearing. Defendant thereafter withdrew her initial plea and pled guilty to the reduced charge of manslaughter. LSA-R.S 14:31. She reserved the right to appeal the trial court's denial of the motions to suppress. See State v. Crosby, 338 So.2d 584 (La.1976). Defendant was sentenced to a two-year term of imprisonment at hard labor.
Defendant has appealed, urging four assignments of error. Assignment of error number four was not briefed and, therefore, is considered abandoned. Uniform Rules, Courts of Appeal, Rule 2-12.4.
FACTS
The facts are taken from the following portions of the appellate record: the transcript of the hearing on the motion to suppress; the presentence investigation report; the Affidavit of Probable Cause to Arrest; and the transcript of the sentencing hearing.
At approximately 4:30 a.m. on January 26, 1985, defendant drove her van to the emergency room entrance of the Dixon Memorial Hospital in Denham Springs. Her deceased husband was in the rear of the van. The death certificate reveals that Charlie Vernon Golmon, Sr., died at 4:00 a.m. on January 26, 1985. The immediate cause of death was listed as "hypothermic shock" due to multiple gunshot wounds in the abdomen. Six bullets from a .357 magnum Taurus revolver penetrated the victim's body. He was shot at such close proximity that circular powder burns were found on his chest.
Steven Lennox, an officer with the Denham Springs Police Department, was dispatched to the hospital to investigate a shooting. Lennox arrived at the hospital at 4:41 a.m. and was informed by the emergency room physician that a white male had sustained numerous gunshot wounds in the lower abdomen. Officer Lennox attempted to speak with defendant to ascertain what had happened. He was unable to get a response because of defendant's hysterical condition.
At 5:00 a.m., defendant was given an injection of Valium (10 milligrams) to sedate her. After defendant had calmed down somewhat, Lennox and Ardell Broussard *484 (an officer with the Walker City Police Department) spoke with her. She stated that she and her husband were traveling east on Florida Boulevard in Baton Rouge when they stopped near Shoney's and picked up a black hitchhiker. Defendant stated that her husband went to the rear of the van and fell asleep on the bed. The hitchhiker allegedly picked up a .357 magnum, which was kept between the two captain's seats, went to the rear of the van, and shot her sleeping husband several times. Defendant stated that she stopped the van near Roller City on U.S. Highway 190, and the hitchhiker took $50.00 from her husband's wallet prior to leaving the scene on foot.
Since the shooting occurred near the parish lines of Livingston Parish and East Baton Rouge Parish, both sheriff's offices were notified. Detective Daniel McAllister, an East Baton Rouge Parish sheriff's office detective, and Donald Cowart, a detective with the Livingston Parish sheriff's office, arrived at the hospital at approximately 6:15 a.m.
McAllister and Cowart entered the emergency room area where defendant was lying on a bed. McAllister advised defendant of her rights prior to taping her exculpatory statement. The two men were with defendant for approximately ten minutes. During this time, defendant agreed to speak with the two officers later on that day, when "she got to feeling better," and gave McAllister two addresses where she might be found.
Defendant was released from the hospital at 7:00 a.m. and taken by Jackie Boswell to the Boswell home in Walker. She went directly to bed and fell asleep. Mrs. Boswell testified that McAllister telephoned her home at approximately 9:00 a.m. and asked if he could schedule an appointment with defendant for a polygraph examination at 10:30 a.m. Mrs. Boswell told him that it would be impossible, as defendant had been drugged. McAllister wanted to know what kind of drug she had been given, and Mrs. Boswell told him to call the hospital to determine the medication administered to defendant. Mrs. Boswell stated that McAllister called back a second time and asked to speak with defendant. Mrs. Boswell awakened defendant, who talked to McAllister and told him that she agreed to take a polygraph test in Baton Rouge at 6:00 p.m. and that McAllister was to pick her up.
At approximately 1:00 p.m., Detectives Cowart and Curtis from the Livingston Parish Sheriff's Office arrived at the Boswell residence and asked if defendant was ready to "come talk with them." Mrs. Boswell awakened defendant; and, after approximately ten minutes, defendant was ready to accompany the officers. The officers and defendant drove to the detectives' office in the Livingston Parish courthouse.
After arriving at the detectives' office, Cowart advised defendant of her Miranda rights. She signed a consent to questioning form and indicated that she understood each and every right which had been read to her from the rights form. Defendant reviewed and reiterated, with some elaboration, basically the same exculpatory statement she had previously given at the hospital.
Detective McAllister testified that he met defendant at the Livingston Parish sheriff's office. He did not recall the length of time he spent at the office but estimated that it was approximately two hours. He spoke with some of defendant's family members outside of the detectives' office. He stated that the family had come to check on defendant to see if she was all right, and he informed them that she was fine. He further testified that he did not allow the family to come into the office for a visit because they were in the middle of an interview with defendant and did not want to interrupt it. McAllister testified that defendant did not ask to speak with or see any family member. He stated that he did not inform defendant that her family was there, but he did tell her that she was not under arrest, could come and go as she pleased, and could leave if she wanted to. He stated that he informed defendant's family that she was not under arrest nor in custody.
*485 Defendant's daughter, Theresa Trail, testified that she, her husband, her aunt Hazel (defendant's sister), and another couple went to the Livingston Parish detectives' office to inquire about defendant. She stated that McAllister informed them that defendant did not need a lawyer and that they could meet him in Baton Rouge at his office in a little while. Trail testified that they arrived at the detectives' office in Livingston at 3:00 p.m. She also stated that they subsequently drove to the Baton Rouge courthouse, that McAllister never appeared, and that they waited approximately four to five hours for him.
Gary Trail, defendant's son-in-law, testified that, when they asked McAllister if defendant needed an attorney, he replied that he did not think so because "we know she didn't kill Mickey[2] or anything ... [w]e're just trying to find out what happened." Gary stated that McAllister told them about the hitchhiker and asked whether or not Mickey had a habit of picking up black hitchhikers. Gary replied that he knew that Mickey "didn't care too much for black people."
McAllister testified that he asked defendant whether she was willing to accompany him to Baton Rouge for the purpose of taking a polygraph test. She consented to do so, and the two left the Livingston Parish detectives' office at approximately 4:00 p.m. and drove to the polygraph technician's office. McAllister stated that no questioning regarding this case took place in the car on the way to the technician's office. Defendant rode in the front seat with McAllister.
William Lawrence Carroll, Jr., a deputy sheriff in East Baton Rouge Parish, does the polygraph examinations for the sheriff's office. He has a private office which houses the personal equipment for his private practice and some of the sheriff's polygraph equipment. He is on 24-hour call with the sheriff's office.
Carroll testified that defendant and McAllister were waiting in McAllister's car, in front of his office, at approximately 5:30 p.m. Carroll and his wife, as well as McAllister and defendant, entered the office. Defendant was left alone in the reception/waiting room to read magazines while McAllister conferred with Carroll for approximately 20 minutes. Carroll stated that it was his understanding that defendant was willing to take the polygraph test and that he does not administer the test to any one who is unwilling. Thereafter, Carroll was introduced to defendant as being associated with the sheriff's office. Defendant signed a "hold harmless" release form, which advised her of her Miranda rights and warned her not to sign the form if she did not understand it. The form additionally suggests a consultation with competent counsel in the event it is not understood. Carroll stated that defendant said she understood the form and was willing to sign it. Thereafter, Carroll followed the standard pretest interview questions from a "Q-sheet." During the pretest interview, Carroll gave defendant a "participating Miranda."[3] Carroll testified that defendant indicated she understood every right and was very cooperative. He stated that he was very polite and gentle with defendant and that no promises or threats or any type of coercion were used to get her to speak with him or take the test.
During the pretest interview, Carroll asked defendant to relate, in her own words, what had happened. She related the same story regarding the black hitchhiker to Carroll. Carroll, a prior acquaintance of defendant, told her "it's hard for me to believe that people from Livingston Parish are going to be picking up a black hitchhiker in the middle of the night." Defendant became visibly emotional, began to weep and spontaneously related that she had shot her husband. Carroll asked defendant if she would be willing to repeat *486 the story to McAllister, and she stated that she was. Carroll asked defendant if she would repeat her story to the district attorney or the sheriff, if they were present, and she said she was willing to do so. Carroll asked her if she was willing to write a statement to them because they were not present, and she said she would. Carroll stated that he assisted defendant in the wording of the first paragraph of her written statement and that he suggested she initial the errors she had made. Carroll stressed that the atmosphere was friendly and not at all oppressive.
McAllister testified that he was called into the examination room and that after defendant repeated the inculpatory statement she had made to Carroll, he placed her under arrest and again advised her of her Miranda rights. No further questioning took place after defendant was placed under arrest and had filled out a rights form at the detectives' office because she did not want to speak with the officers. McAllister testified that he took defendant to the parish jail booking desk and left her there.
Defendant's brother, Thomas Ray Judd, testified that he saw his sister in the parish prison during the early morning hours of January 27, 1985, and that she appeared to be in "very bad shock." He stated that his sister related to him that she confessed only because she was told that in exchange for a written confession she would be able to go home to her children.
ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends the trial court erred in failing to suppress her confession. Defendant submits the confession was obtained in contravention of her Fifth and Fourth Amendment rights. See U.S. Const.Amend. IV. and V. We elect to address the Fifth Amendment claim first and then consider the Fourth Amendment issues.
FIFTH AMENDMENT CLAIM
Defendant contends the state failed to carry its burden of proving her confession was free and voluntary and of proving a knowing and intelligent waiver of her rights under Miranda. She claims that her mental state at the time of the confession was such that it vitiated any voluntariness on her part. Additionally and, we presume, in the alternative, defendant claims that the confession was induced by the promise that she would be allowed to go home and rejoin her children after giving a written statement. The state contends the record is clear that defendant's confession was free and voluntary and that she knowingly and intelligently waived her Miranda rights.
It is well settled that before a confession or inculpatory statement can be introduced into evidence, the state has the burden of affirmatively showing that it was made freely and voluntarily, and not influenced by fear, duress, intimidation, menaces, threats, inducements, or promises. LSA-C.Cr.P. art. 703(G); LSA-R.S. 15:451; State v. Whitaker, 489 So.2d 998, 1001 (La.App. 1st Cir.), writ denied, 494 So.2d 324 (La.1986); State v. Brown, 486 So.2d 876, 878 (La.App. 1st Cir.), writ denied, 489 So.2d 915 (La.1986). The trial court's determination that the state has met its burden of proof with regard to voluntariness is entitled to great weight. Furthermore, the determination of a witness's credibility on this issue, being a function of the trier of fact, is entitled to great weight. Whitaker, 489 So.2d at 1001.
In brief, defendant alleges specific instances of police misconduct in reference to the statement she gave to Carroll and McAllister. The state is required to rebut this allegation specifically. Brown, 486 So. 2d at 878. Defendant's brother, Thomas Ray Judd, testified that defendant related her reason for confessing. Allegedly, defendant stated that she was induced to confess only because McAllister assured her that, if she would confess and sign a piece of paper, he would take her home to her children. Carroll's testimony, as previously set forth in detail, specifically rebutted defendant's allegation.
The trial court's determination that the statement was given without influence or *487 promise is entitled to great weight. We are unable to say that the trial court erred in finding the statement to be freely and voluntarily given.
Alternatively, defendant claims that her confession should have been suppressed due to the fact that her mental condition at the time was such that she was incapable of giving a voluntary statement or of knowingly and intelligently waiving her rights. She argues that State v. Glover, 343 So.2d 118 (La.1976), is dispositive of this issue and attempts to buttress her claim with expert psychiatric testimony. Moreover, defendant contends that the state has the burden of proving, beyond a reasonable doubt, that the mental defect she allegedly possessed did not affect the voluntariness of her confession.
We note at the outset that the state may rely on the presumption of sanity provided in LSA-R.S. 15:432, leaving to defendant the burden to prove the existence of a mental abnormality which, under the circumstances, may have destroyed the voluntary nature of his confession. State v. Waymire, 504 So.2d 953, 958 (La.App. 1st Cir.1987), citing Glover, 343 So.2d 118. A claim of mental illness or introduction of evidence in support thereof does not shift the ultimate burden of voluntariness from the state. If defendant fails to prove the existence of a mental defect or fails to prove that such disorder prevented his confession from being voluntary, the state is not required to negate defendant's mental abnormality; but it must in all other respects prove beyond a reasonable doubt that the confession was voluntary. Waymire, 504 So.2d at 958. Because a defendant is presumed competent, the defendant has the burden of proving a mental defect making her unable to understand her Miranda rights and, therefore, incompetent to waive them. Waymire, 504 So.2d at 958.
At the hearing on the motion to suppress, Dr. Louis Cenac, Jr., an expert in the field of psychiatry, testified that he was asked to examine defendant, seven months after the shooting, to determine her ability to discriminate between right and wrong at the time of her confession. He recounted a personal history which had been related to him by defendant. Specifically, he stated that defendant had been involved in an extraordinary pathological sexual relationship, which he labeled sadomasochistic, with her husband. Dr. Cenac stated that defendant's ability to control her own destiny had been eroded due to this pathological relationship. He opined that defendant's deceased husband controlled defendant totally so that she was psychologically paralyzed. Dr. Cenac testified that fatigue coupled with Valium would have augmented the cumulative effect of each on defendant and would have contributed to decreasing defendant's normal guardedness and alertness. He stated that defendant's ability to understand and intelligently waive her Miranda rights was severely compromised.
The hospital records indicate that at least twelve hours had elapsed from the time Valium was administered to defendant and the time of the confession (between 5:30 and 7:00 p.m.). Moreover, defendant slept soundly for several hours, thereby providing her some time to rest and recover from fatigue and the effects of sedation.
Carroll testified that although defendant appeared tired, she was alert and cognizant and seemed to be very intelligent. In fact, during the administration of the "participating Miranda," defendant indicated to him that she understood each and every right and that she had been informed of the same several times throughout the day. Carroll testified that defendant became emotional and began to weep when recounting the events which led her to shoot her husband. He stated that, although emotional, she was not hysterical and out of control.
The record reflects that defendant was emotionally distraught and tired at the time of the confession. However, emotional distress alone is not grounds for rendering a confession inadmissible unless it is so severe that the party confessing is unable to voluntarily do so. The record does not indicate that defendant lost control or became overly emotional. See State v. Beck, *488 445 So.2d 470, 474 (La.App. 2d Cir.), writ denied, 446 So.2d 315 (La.1984).
Defendant was undoubtedly feeling the stress of the consequences resulting from the shooting of her husband. However, any such stress-related condition is not analogous to the organic brain damage from which the defendant in Glover suffered. Glover had been on anti-psychotic drug therapy. There is no indication that defendant is similary affected. See State v. West, 408 So.2d 1302, 1308 (La.1982).
The trial court apparently gave little weight to Dr. Cenac's testimony. Expert opinion testimony is admitted because the expert is uniquely skilled at drawing inferences; his conclusions from real or hypothetical facts are more helpful to the fact finder than the facts themselves without conclusions. The fact finder retains the right and power to accept or reject the expert's conclusions. State v. Myles, 432 So.2d 1018, 1020 (La.App. 1st Cir.1983).
The determination of the admissibility of a confession is a question of fact for the trial court, and its conclusions will not be disturbed unless not supported by the record as a whole. State v. Perry, 502 So.2d 543, 553 (La.1986), cert. denied, ___ U.S. ____, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). The state carries a heavy burden of proving the waiver of constitutional rights was knowingly and intelligently made. See State v. Penns, 407 So.2d 678, 680 (La.1981).
Defendant is a literate, 44-year-old woman who had several children and had been gainfully employed. She was given her Miranda rights several times, and she acknowledged her comprehension of those rights each time. Moreover, she read and executed several forms incorporating her rights. Defendant willingly spoke with Carroll and McAllister. She indicated sufficient presence of mind to concede that she had lied on previous occasions and was telling the truth at the time she confessed.
The ruling of the trial court that the confession was not obtained in contravention of defendant's Fifth Amendment rights finds support in the record. We find no error.
FOURTH AMENDMENT ISSUE
Defendant argues that her Fourth Amendment rights and her rights under Art. I, § 5, of the Louisiana Constitution of 1974 were violated because she was illegally arrested and because her confession was obtained through custodial interrogation after the illegal arrest.
The state submits that defendant was not under arrest at the time of her confession. The state further submits that defendant voluntarily and in the spirit of apparent cooperation, accompanied law enforcement officers for the purpose of helping them investigate her husband's shooting.
After hearing the motions to suppress and listening to oral argument on the issues, the trial court ruled that there was no Fourth Amendment issue presented. The trial court stated that on the morning of January 26, 1985, defendant agreed to speak with Cowart regarding the incident at a later time that day. That same morning, defendant agreed to accompany McAllister to Baton Rouge in order to take a polygraph examination. The trial court ruled that the officers were not obligated to tell defendant that she had a right to refuse to accompany them at a later time for a polygraph test or for questioning.
In brief, defendant appears to contend that she was involuntarily escorted from the Boswell residence by police. She complains that she was not advised that she could refuse to accompany the officers and that her daughter was not allowed to accompany her. Defendant contends the circumstances of this case are indicative of a de facto arrest and unlawful custodial interrogation. She argues that her later confession should have been suppressed because she was under actual restraint and her will was overborne.
An "arrest" occurs when circumstances indicate an intent to effect an extended restraint on the liberty of the accused, rather than at the precise time an officer tells the accused he is under arrest. State v. Raheem, 464 So.2d 293, 296 (La. 1985). Whether or not a person has been *489 taken into custody, detained, or deprived of his freedom in a significant way must be decided by an objective test, by an evaluation of the totality of the circumstances. State v. Thibodeaux, 414 So.2d 366, 368 (La.1982).
In Thibodeaux, 414 So.2d at 366, police officers went to defendant's residence in plain clothes and an unidentified car. The officers identified themselves to defendant and told him that they were investigating a gas station burglary. They advised him of his Miranda rights and asked him if he would come to the police station for questioning. The detective testified that he did not go to defendant's house with the intention of arresting him, but he wanted to bring defendant to the station because he anticipated an extended interrogation and wanted access to police reports. The court found that, applying the totality of circumstances test, the defendant voluntarily accompanied the police to the station and there was no illegal arrest.
In State v. Copeland, 419 So.2d 899 (La. 1982), the defendant was asked to come to the police station to help with a missing persons investigation. Defendant agreed to come and was not under arrest or handcuffed at that time. Defendant was read his rights before being interviewed. After thirty or forty minutes of questioning, when the police officer became suspicious that defendant knew more about the crime than he had revealed, the officer had defendant execute a formal written waiver of rights form. At no time did defendant ask to have an attorney or refuse to answer questions. Defendant voluntarily went to the police substation.
In State v. Dickinson, 492 So.2d 173 (La.App. 1st Cir.), writ denied, 498 So.2d 14 (La.1986), this court ruled that, under the totality of circumstances, viewed objectively, the defendant accompanied the officers to the police station and agreed to speak with them voluntarily in a spirit of apparent cooperation. The defendant was approached by three plain clothes police officers at home and was advised of the reason for their request to speak with him before he invited the officers inside his home. The defendant was advised of his Miranda rights. He consented to traveling to police headquarters (in his own vehicle) to submit to physical samples to supplement the investigation. The defendant was specifically told that he did not have to travel to the police station and that he was not under arrest.
We have set forth above in some detail the facts pertinent to our review of this case. We deem it unnecessary to repeat them to address this issue. Suffice it to say that the record reflects that defendant, by her own admission, was a witness to the murder of her husband. As the surviving spouse, she presumably would have had an interest in seeing that her husband's murderer was apprehended and brought to justice. Moreover, defendant was the sole witness to the crime. Under the circumstances, defendant's cooperation with law enforcement personnel is not suspect nor surprising. The fact that defendant might refuse to accompany the detectives was a possibility. However, the detectives need not have so informed defendant. See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The record supports a finding that defendant voluntarily accompanied the detectives in the spirit of apparent cooperation and that her consent to do so was voluntary.
Voluntariness is a question of fact to be determined by the trial court. Its ruling is entitled to great weight on appeal. Based on the totality of the circumstances, it appears from the record that defendant voluntarily consented and accompanied the police officers to the station for questioning. The ruling of the trial court denying defendant's motion to suppress is supported by the record. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER TWO
Defendant contends that the trial court erred in failing to suppress physical evidence allegedly seized as the product of an illegally obtained confession and cites Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
*490 The trial court ruled that the confession was not illegally obtained and, therefore, suppression of any physical evidence obtained as a direct result of the confession was not necessary.
Defendant stated that she discarded the gun she used to shoot her husband in a canal near Denham Springs. The day after defendant's confession, the gun was retrieved by law enforcement personnel.
As discussed in the previous assignment of error, defendant voluntarily accompanied law enforcement officers and gave inculpatory statements. There was no evidence of coercion or officer misconduct. Therefore, the physical evidence seized as a result of defendant's confession is not "fruit of the poisonous tree" and need not be suppressed.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER THREE
Defendant contends the trial court erroneously failed to comply with LSA-C.Cr.P. art. 894.1. Specifically, defendant claims that she provided reasons for a probated sentence rather than a term of imprisonment and that the trial court did not address the points she raised. Defendant contends that, due to the mitigating circumstances of this case, leniency was in order. Defendant requests that the sentence be vacated and the case remanded for resentencing.
Although a sentence falls within the statutory limits, it may be excessive. State v. Sepulvado. 367 So.2d 762 (La. 1979). However, the trial court has wide discretion in the imposition of sentences; and a sentence within the statutory limits will not be set aside in the absence of an abuse of discretion. State v. Johnson, 486 So.2d 853 (La.App. 1st Cir.1986).
LSA-C.Cr.P. art. 894.1 requires the trial court to weigh both aggravating and mitigating circumstances in determining whether or not to impose incarceration. While the trial court is not required to articulate every such circumstance in imposing sentence, the record must reveal adequate consideration of the guidelines enumerated in art. 894.1. State v. Banks, 457 So.2d 1264, 1266 (La.App. 1st Cir.1984).
The record reflects that the trial court complied with the requirements of article 894.1 and considered defendant's personal history. Defense counsel introduced psychiatric evaluations of defendant, which indicate that she is unlikely to commit another crime. Defendant has no prior criminal record. Defense counsel argued that the presentence investigation report failed to consider community alternatives to incarceration for defendant. Additionally, she urged that defendant acted under strong provocation when she shot her husband. Defendant introduced the minute entries in three criminal cases wherein the defendants were convicted of manslaughter and placed on active supervised probation. At that time, the State reminded the trial court that it had a duty to particularize the sentence to the defendant and the facts of the case.
The trial court sentenced defendant to a two-year term of imprisonment at hard labor, with credit for time served. The trial court stated that defendant is in need of correctional treatment which can best be provided in a custodial environment. Defendant's initial attempt to avoid prosecution by lying to investigators regarding the death of her husband, coupled with the serious nature of the crime, warrants punishment. The trial court stated that defendant has a propensity to use firearms when angry.
The trial court was particularly impressed with the ferocious manner in which defendant shot her husband. It noted that defendant was asleep when she shot him six times at such close proximity that there were powder burns on his chest. The trial court additionally stated that it had closely examined all documents submitted by defendant to explain, excuse, and mitigate her confessed slaying of her husband.
Although denying initially that she ever used a gun, as she did today in court, after being asked direct questions by an interviewer, as by the court this morning. *491 With some prior knowledge of the facts, the accused admitted pulling a gun on her first husband and actually shooting at him in February of 1981. She also admitted pulling a gun on one Rodney McAllister more recently. Unstated `sexual problems' were the accused's reason for divorcing her first husband. Accused's marriage to the victim, her second husband, was marked by disagreements and separations throughout its course. Although the accused left her second husband, the decedent, several times, she always voluntarily returned. As testified today, she alleged that threats were made against her children, but that she was not physically forced to return, but voluntarily returned each time to the deceased's home. Her husband, the decedent, never went after her nor forced her to return to him. The accused had many options open to her. This is important. None of these options would involve the killing of her husband. Human life is sacred and should not be taken by another human being and is only justified under certain narrow and clearly defined circumstances under our law. This case is not one of those exceptions. There are many allegations on both sides about which we will never know the `truth', but the court does conclude that under the facts and circumstances which the court knows have been established in this case, this sentence of the court fits the crime.
The record is clear that the trial court satisfied the requirements of LSA-C.Cr.P. art. 894.1 and that the sentence is not a needless imposition of pain and suffering, nor is it grossly disproportionate to the severity of the offense. Defendant was exposed to a potential sentence of 21 years' imprisonment at hard labor. See LSA-R.S. 14:31. She received a sentence of two years' imprisonment at hard labor. While the facts leading defendant to kill her husband reflect an unfortunate and sad personal history, they do not justify or mitigate the offense.
This assignment of error is without merit, and defendant's conviction and sentence are affirmed.
AFFIRMED.

*492 ADDENDUM

NOTES
[1] In the appellate record, Carol Golmon's last name is sometimes spelled "Golman." Our review of the record, however, convinces us that the correct spelling is "Golmon."
[2] "Mickey" was apparently the decedent's nickname.
[3] Carroll establishes a dialogue with his subjects and, instead of advising them of their rights in a monologue fashion, gets the subjects to converse with him and answer him that they know and understand what their rights are. A copy of his "Q-sheet" is attached hereto as an addendum.