600 So.2d 739 (1992)
STATE of Louisiana
v.
Joseph JACKSON.
No. 91-KA-0341.
Court of Appeal of Louisiana, Fourth Circuit.
May 12, 1992.
*740 M. Craig Colwart, Orleans Indigent Defender Program, New Orleans, for appellant.
Harry F. Connick, Dist. Atty. and Hans P. Sinha, Asst. Dist. Atty., New Orleans, for appellee.
Before PLOTKIN, JONES and WALTZER, JJ.
JONES, Judge.
Defendant, Joseph Jackson, appeals his conviction for the second degree murder of his wife, Unae Jackson. We affirm the trial court's judgment.
In the early evening of April 1, 1989, the defendant entered the N.O.P.D. Fifth District Police Station and told the officer at the desk that he had accidentally shot his wife to death. Defendant told the officer that he had been under a lot of pressure, that his wife was no longer a good wife or mother, and that he "could not take it anymore." Defendant appeared to be a little upset, but did not appear to be intoxicated.
Defendant was transported back to his house. While the defendant was seated in the back of a police car, after indicating that he understood his rights, he told the officers that he had an argument with his wife. Defendant told them that his wife did not want to care for him or his children. He stated that he grabbed a gun from the toolbox next to the refrigerator and shot her. Defendant refused, however, to make a written statement.
A police unit was dispatched to the defendant's house at 6335 Law Street. The investigating officer testified that the front door of the house was partially opened. He entered and found a gun lying near the door. The officer walked through the house to the kitchen where he found the body of Unae Jackson. In addition to Mrs. Jackson's body, the police found that the telephone had been torn off the wall. A set of keys was found on the floor, and there was an open wooden box containing tools next to the refrigerator.
It was determined that Mrs. Jackson had been shot in the left cheek, the upper neck, and the left hand. It was estimated that Mrs. Jackson's face and neck were more than a foot from the gun, but her hand was within a foot of the gun when shot.
On May 18, 1989, the defendant was indicted for second degree murder. He was arraigned on May 23rd and pled not guilty. On June 14th, he filed a motion for the appointment of a sanity commission, and on August 1, 1989, he was found incompetent to proceed. However, on June 21, 1990, he was found competent. On January 14, 1991, he amended his plea to not guilty/not guilty by reason of insanity and stood trial before a jury. A twelve-member jury found him guilty as charged. He was sentenced on February 7th to life imprisonment without benefit of parole, probation, or suspension of sentence. It is from this judgment that defendant appeals.
A review of the record for errors patent reveals there are none.
By his first assignment of error, the defendant contends the trial court erred by finding he was competent to stand trial. On August 1, 1989, he was found incompetent to stand trial. However, he was reevaluated, and on June 21, 1990, he was found competent.
La.C.Cr.P. art. 641 defines mental incapacity as existing when "as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." See State v. Gurley, 565 So.2d 1055 (La.App. 4th Cir.1990), writ den. 575 So.2d 386 (1991). In State v. Bennett, 345 So.2d 1129, 1138 (La.1977), the Court set forth factors which the trial court must take into consideration when determining whether a defendant is competent to proceed to trial:
Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty *741 plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. See, State v. Augustine, supra [252 La. 983, 215 So.2d 634 (1968) ]; Robey, Criteria for Competency to Stand Trial: A Checklist for Psychiatrists, 122 Am.J. of Psychiatry, at 616: Note, 6 Loyola Univ.L.J. at 684-85; Note, 4 Columb.Hum.Rights L.Rev. at 245.
See also Gurley, at 1059. In its determination of competency, the trial court may seek the opinion of medical experts, but the ultimate decision rests solely with the trial court. State v. Brooks, 541 So.2d 801 (La. 1989); State v. Lowenfield, 495 So.2d 1245 (La.1985), cert. den. Lowenfield v. Louisiana, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). The court's determination is to be given great weight and should only be disturbed on a showing of an abuse of the court's discretion. Lowenfield; Gurley.
Here, at the original competency hearing, Drs. Cox and Ritter testified they examined the defendant and found that his I.Q. level was in the mildly retarded range, with a mental age of eight years old. In their opinions, the defendant was unable to assist in his defense and did not appear to understand the charges against him or the legal process as a result of this mental retardation. The doctors noted that the defendant had attended special education classes up until the fifth grade, when he stopped attending school, and both indicated that the defendant could not read or write. When asked if it was possible that the defendant was malingering, both doctors recognized this possibility, and because of that, both doctors recommended that the defendant be remanded to the Feliciana Forensic Facility where he could receive additional testing to evaluate further his competency. Based upon these opinions, the trial court found the defendant incompetent to stand trial, and he was remanded to Feliciana.
However, in June, 1990, Dr. Ritter sent a letter to the trial court indicating that he was of the opinion that the defendant was competent to stand trial and that he might have been malingering. At the subsequent hearing, Dr. Ritter testified that he had reexamined the defendant and found him to be competent. Dr. Ritter testified that the defendant's I.Q. seemed to have improved since the last hearing; the defendant was now testing at a twelve-year-old level. Dr. Ritter testified that the defendant appeared to understand the charge against him, the proceedings, the possible penalties, and his rights, and the defendant had told him his version of what happened the day he shot his wife. He also testified that the defendant was not on medication. In Dr. Ritter's opinion, the defendant could assist in his own defense. There was a stipulation that Dr. Juarez-Nunez, who had also examined the defendant, would testify to the same opinion. The defendant then took the stand. He estimated the length of time he had been in jail (which in fact was a few months less than he estimated) and indicated that he knew the crime with which he was charged. He testified he attended special education classes through the sixth grade (five in Louisiana and one in California) and that he could read a little. He testified that he had been trying to improve his reading skills while in Feliciana. Based upon this testimony, the trial court found him competent to proceed.
The defendant now argues that the trial court erred in finding him competent to *742 proceed to trial because Dr. Ritter did not present a factual basis for the change in his opinion from the first hearing. However, as noted in the State's brief, the letter written to the trial court in June, 1990, indicated that there was some doubt at the time the defendant was found incompetent that he was malingering. As noted above, at the original hearing both doctors recognized this possibility and based their opinions for commitment partially upon their belief that additional testing at Feliciana would give the court a clearer picture of the defendant's true competency. In addition, the defendant himself admitted he could read a little, that he understood the charge against him, and that he had been trying to improve his reading skills while incarcerated. Given these factors, it does not appear that the trial court erred by finding him competent to stand trial.
In a footnote, the defendant also argues that his confinement on the psychiatric tier at Orleans Parish Prison, "O.P.P.", during the trial and his present confinement in the forensic ward at Angola shows that he should not have been found competent to stand trial. With respect to his placement on the psychiatric ward at O.P.P., Dr. Juarez-Nunez testified at trial that not all inmates placed on the psychiatric tier are insane but may have been sent for observation for other reasons. With respect to the defendant's continued confinement in the forensic ward of Angola, there may be other factors which may account for his placement there.
Based upon the evidence presented at the two competency hearings, it does not appear that the trial court erred. This assignment has no merit.
By his second assignment of error, the defendant contends that the trial court erred by denying his motion to suppress the confession. He basically argues that the trial court should not have found his statements made to the police were freely and voluntarily given because he was found to be incompetent to proceed a few months after giving his confession. Although the State alleges that defendant refers only to his first statement at police headquarters with respect to this assignment and not also to the confession he gave while in police custody in an officer's car at the killing scene, a careful reading of the defendant's assignment two reveals that the defendant does not specifically refer only to this first confession. Rather it speaks of the defendant confessing after stabbing his wife. Because this language could be interpreted as encompassing both of these confessions, we will address the admissibility of both of them.
The State has the burden of proving that a statement given by a defendant was freely and voluntarily given, not the product of threats, promises, coercion, intimidation, or physical abuse. La.R.S. 15:452; State v. Seward, 509 So.2d 413 (La.1987); State v. Brooks, 505 So.2d 714 (La.1987), cert. den. Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Daliet, 557 So.2d 283 (La.App. 4th Cir. 1990). To establish the admissibility of a statement made by an accused person in custodial interrogation, the State must prove that the accused had been advised of his Miranda rights and that he waived these rights prior to interrogation. Brooks; Daliet. The determination of a statement's admissibility is within a trial court's discretion, and it should not be disturbed unless it is not supported by the evidence. Brooks; Daliet.
With respect to the first statement, Off. Defillo testified at the first suppression hearing that he was on desk duty at the Fifth District when the defendant walked in and told him that he had shot his wife. At the hearing, Off. Defillo testified that the defendant made this statement without any prompting from him. The only difference in his trial testimony was his statement that he asked the defendant if he could help him when the defendant first walked in. It was clear from both of these transcripts, however, that the defendant was not under any sort of police custody or interrogation when this statement was made, but rather he voluntarily entered the police station and spontaneously confessed to the shooting. In State v. Johnson, 482 So.2d 186 (La.App. 4th Cir. *743 1986), writ den. 486 So.2d 749 (1986), this court noted that a voluntary, spontaneous statement is admissible without Miranda warnings, even if the defendant is in custody when the statement is made. See also State v. McPhate, 393 So.2d 718 (La.1981). Because the statement made to Off. Defillo was a spontaneous statement, it was admissible.
With respect to the second statement, it was stipulated at the suppression hearing that the defendant was advised of his Miranda rights while he was sitting in a police car at the scene of the shooting. Homicide Det. Saladino testified that after being so advised, the defendant stated he understood his rights. Det. Saladino testified that the defendant was remorseful and coherent. He testified that the defendant told him that his wife had stopped cooking and caring for the children, that they had argued, and that he had grabbed a gun and shot her. Det. Saladino's testimony at trial was very similar, and he testified at trial that the defendant seemed a little upset when making his statement.
The defendant argues that his statement should have been suppressed because he was incompetent to understand the implications of making the statement, and thus, it was not freely given. In support, he cites State v. Coleman, 369 So.2d 1286, 1291 (La.1979), where the Court stated: "Where insanity is an issue, in the context of a proceeding to determine the voluntariness of a confession, (and, thus, its admissibility) the state must prove that the defendant's mental defect did not preclude the voluntary giving of a confession." In Coleman, the defendant had been examined by a sanity commission which found that the defendant was psychotic and probably had been so for a few years, and this psychosis could have led him to be unable to distinguish right from wrong and would have rendered him incapable of understanding his rights. On review, the Court found that the trial court's determination that the defendant had understood and freely waived his rights prior to giving his statement was not supported by the facts of the case.
Coleman is distinguishable from the instant case. Here, unlike in Coleman, there was no testimony from members of the sanity commission that the defendant was unable to understand his rights and the ramifications of waiving them. Instead, Dr. Ritter testified that it appeared likely that the defendant had been "malingering" when first examined and committed. Indeed, both doctors of the first sanity commission testified that their recommendation for commitment was based in part on a desire to have the defendant tested further to determine his mental state more accurately. In addition, there was no evidence here of any psychosis on the defendant's part which would render him incapable of understanding his rights.
In State v. Lefevre, 419 So.2d 862, 865 (La.1982), the Court stated:
The law is clear that when the issue on appeal is whether an accused's level of intellectual disability precludes him from effectively understanding the essential nature of his rights to silence and counsel and of the consequences of his speech, much weight is accorded to the trial court's assessment. State v. Coleman, [supra]; State v. Trudell, [350 So.2d 658 (La.1977)]; State v. White, 329 So.2d 738 (La.1976). Once the trial judge has determined that the state has met its burden of proof, his decision is entitled to great weight on review. State v. Coleman, supra; State v. White, supra; State v. Hall, 257 La. 253, 242 So.2d 239 (1970).
The Louisiana Supreme Court long ago set forth the standard by which a court should determine whether a confession was freely given where there are indications of incompetency on the part of a defendant. In State v. Glover, 343 So.2d 118, 128 (La. 1976), on rehearing, the Court noted:
a claim of mental illness or introduction of evidence thereof does not shift the ultimate burden of proof of voluntariness from the State. If the defendant fails to prove the existence of a mental illness or defect or fails to prove that such a disorder prevented his confession from being voluntary, the State is not required to *744 negate the defendant's mental abnormality, but the State must in all other respects prove beyond a reasonable doubt that the confession was voluntary.
See also State v. Golmon, 536 So.2d 481 (La.App. 1st Cir.1988), cert. den. Golmon v. Louisiana, 493 U.S. 832, 110 S.Ct. 104, 107 L.Ed.2d 67 (1989). In addition, "diminished mental capacity or intellectual capacity likewise does not of itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession." State v. Woods, 553 So.2d 985, 988 (La.App. 4th Cir.1989), writ den. 575 So.2d 385 (1991) (emphasis added). See also State v. Benoit, 440 So.2d 129 (La.1983); State v. Bueno, 499 So.2d 362 (La.App. 4th Cir.1986).
Here, the only evidence the defense "presented" to show the defendant's inability to understand and waive his rights knowingly was defense counsel's argument that he had been found incompetent two months after the confession, so he must have been incompetent at the time he gave the confession. However, by the time of the first hearing on the motion to suppress the confession, the defendant had already been found to be competent to proceed to trial. At the second sanity hearing, the examining doctor testified that further testing of the defendant at Feliciana while he was committed led him to believe that the defendant may have been malingering when he was first examined and committed. Although the defense proved the defendant had a diminished mental capacity, it did not prove that this mental defect robbed the defendant of his ability to understand his rights and the consequences of the waiver of these rights. Thus, the trial court did not err by finding that the State adequately proved the confession was freely and voluntarily given. This assignment is without merit.
By his third assignment of error, the defendant contends the trial court erred by limiting the defense examination of Kathleen Washington, the defendant's sister, who reluctantly testified for the defense. The defendant argues that he called this witness to help establish his mental incapacity by providing instances of bizarre behavior where he accused people of trying to poison him or his children. He contends that the trial court sustained the State's objections to defense counsel's questions on the basis that they called for hearsay statements made by the defendant, which actually were admissible under La. C.E. art. 803(3) to show his existing mental condition. Article 803 provides in part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact remembered or believed, unless it relates to the execution, revocation, identification, or terms of declarant's testament.
However, a reading of the transcript of Ms. Washington's testimony shows that most of the objections were sustained on different grounds and that the desired information was eventually elicited from Ms. Washington.
With respect to the first objection, defense counsel asked Ms. Washington if she ever observed the defendant "do anything that might be considered bizarre, strange, or unusual". The State objected, and the court ordered defense counsel to rephrase his question. Defense counsel then asked Ms. Washington about an incident where she gave the defendant's children Easter baskets, and the State objected to the relevancy of this question. After a bench conference, Ms. Washington was allowed to testify as to the incident and the defendant's belief that the Easter baskets were poisoned. Defense counsel asked her if there was "any logical reason at all for Joseph to think that you would be attempting to poison his children", and the State objected. Defense counsel then rephrased the question, and Ms. Washington answered the question.
*745 Defense counsel next asked if the defendant thought someone was trying to poison him, and Ms. Washington replied, "Yes." Defense counsel asked, "who?", and the State objected on the basis of hearsay. Defense counsel responded that the answer would be an exception to the hearsay prohibition. There was some discussion as to when this conversation took place, and the court then told defense counsel to lay a foundation for the statement's admission. Defense counsel then told Ms. Washington "you said he felt that someone was trying to poison him", and the State objected. The court sustained the objection "at this point in time because of what I said", apparently referring to the defense counsel's failure to lay a proper foundation. Defense counsel then asked Ms. Washington if the defendant took any actions because he felt the deceased was trying to poison him, and the State again objected. The court asked when this occurred, and defense counsel stated it happened the year before. There was no ruling on the State's objection, and defense counsel then asked Ms. Washington if the defendant was "under that impression at the time she died". The court then stated that the witness could not testify as to what the defendant thought.
There was a short discussion, and then defense counsel asked Ms. Washington if the defendant kept his clothes locked up. She replied "that's what Unae [the victim] told me", and the State once again objected. Defense counsel moved to approach the bench, the State withdrew the objection, and defense counsel then reiterated that the victim told Ms. Washington that the defendant locked up his clothes. The State objected, there was a short, confused discussion, and a bench conference was held. The last question was read back, the court sustained the objection, and another bench conference was held. Defense counsel then asked the same question, and Ms. Washington was allowed to testify about this matter. On redirect, the only objection made by the State was to the question of whether the defendant ever accused Ms. Washington of trying to poison his clothes, and this objection was overruled.
Thus, although some of the State's objections were sustained, they were sustained on grounds different than a prohibition of hearsay. In addition, defense counsel was ultimately able to elicit testimony from Ms. Washington concerning the defendant's belief that she had given his children poisoned Easter baskets, his belief that someone (possibly the decedent) was trying to poison him and thus locked up his clothes to keep them from being poisoned, and his accusation to her that she was trying to poison his clothes. This assignment has no merit.
Accordingly, the defendant's conviction and sentence is affirmed.
AFFIRMED.