FRED W. JONES, Jr., Judge.
Indicted for second degree murder, the defendant Mrs. Dorothy Bagwell was tried by jury and found guilty of manslaughter. She was sentenced to prison for 12 years. *876 The defendant appealed, reserving five assignments of error. Finding reversible error in two of those assignments, we preter-mit consideration of the other assignments.
After some 20 years of marriage, James Bagwell and Dorothy Bagwell were separated in June 1985. As a consequence of legal proceedings, the husband was awarded temporary use of the family home while the wife was to receive alimony pendente lite. It was arranged that Mrs. Bagwell would visit the family home on the morning of August 3, 1985 to secure personal possessions and return some guns to her husband.
Mrs. Bagwell placed her husband’s loaded service revolver in her purse and returned to her former residence. Entering the house, she found Bagwell sitting on the commode with his pants down. Mrs. Bag-well returned to the living room with purse in hand, heard the commode flush, and went back to the bathroom door. The bathroom sink was located to her immediate right; next to the sink and along the right hand wall was the toilet; and the bathtub was parallel to the back wall, with the drain located next to the right hand wall. Mrs. Bagwell contended she laid the revolver on a bathroom cabinet, but grabbed it back when her husband reached for the weapon to shoot her with it. She fired several times at her husband, fatally wounding him, and also shot herself. This proceeding followed.
At the trial numerous friends, family members and acquaintances testified as to Mrs. Bagwell’s peaceful nature and reputation for non-violence. At age 60, Mrs. Bag-well had no prior criminal record and the State presented no evidence to contradict the testimony of Mrs. Bagwell’s character.
Those same witnesses testified as to Bagwell’s character and characterized him as an extremely violent, possessive and overbearing person. Numerous examples of the violence inflicted on Mrs. Bagwell during her 20 years of marriage to Bagwell were cited. Donna Pittman White, Mrs. Bagwell’s niece, testified that she saw Bag-well walk behind her aunt, grab her aunt by the hair of her head, shake her head and throw her head forward. He was always calling her a “crazy old woman” in Ms. White’s presence. Bagwell once stated to Ms. White that he was going to get rid of that old woman. When Ms. White asked if he meant a divorce, he responded and said, “no, there are other ways.”
Kathy and Paul Chriss, Jr., rented an apartment behind the Bagwell home for four years. They eventually moved because the apartment became too small and they were tired of listening to the Bagwells fighting. During one instance, Kathy heard yelling in the yard. When she looked out her kitchen window, Bagwell had Mrs. Bagwell by the hair and was dragging her across the ground as she kicked. Bagwell yelled at her to get in the house. Mrs. Bagwell responded by screaming, “no, I know what you’ll do when I get in there.” Bagwell dragged her into the house, pulling her by her hair. Although Mrs. Bagwell was kicking her legs trying to escape, she never fought back.
Another time Kathy was looking out her window and the Bagwells’ kitchen door was open. Bagwell hit Mrs. Bagwell in the face with his fist. She went down, apparently knocked out. Bagwell then ran out the back door, knocking the screen door off the hinges.
Kathy testified that she had heard Bag-well threaten Mrs. Bagwell but that Mrs. Bagwell never fought back. She stated to Kathy that she was afraid that Bagwell would kill her while she slept. Mrs. Bag-well was observed to have bruises on her wrists and arms and burns on her arms similar to cigarette burns.
Paul Chriss heard a racket in the yard and looked out his window. Bagwell was again dragging Mrs. Bagwell by her hair. Bagwell kicked at her and threw her in the house. He then tore the screen door off the hinges and bent it over his knee and threw it in the yard. He sat on the porch for a short period of time, got up, busted the door down and went inside. Paul could hear screaming from inside.
Mrs. Bagwell testified that shortly after her marriage to Mr. Bagwell, her son, *877 Mike, and daughter, Sheila, left to live with their grandmother because they could no longer stand to be around Bagwell. Both children were in their early teens. According to Mrs. Bagwell, the physical violence started after the third or fourth year of marriage to Bagwell. It began with milder incidents, where Bagwell would mash her fingers and pinch her arms to such an extent as to make her leave. He would later apologize and blame it on drinking. Bagwell was always drinking.
According to Mrs. Bagwell’s testimony, one of Bagwell’s favorite forms of torture was walking up behind her and pulling on her hair, so as to jerk her head around, hard enough to pull handfuls of hair out. There were also incidents where Bagwell tore the clothes off of her and would kick her and hit her with his fist. One time, Bagwell hit her in the eye hard enough that she suffered a detached retina.
Bagwell threatened to kill Mrs. Bagwell. He regularly told her that “I’m going to kill you, you crazy old woman.” Often, he would insinuate that her death was being contemplated by commenting that, while standing on the edge of a mountain if a body were to fall over the edge, it would probably be lost forever; or, while deep sea fishing the sharks would take care of any body tossed overboard.
In 1984, Bagwell started telling Mrs. Bagwell that the telephones were bugged and that he had recording devices hidden throughout the house. Anything that Mrs. Bagwell did, he would know of. When Bagwell informed her that he was recording her voice, Mrs. Bagwell felt that she had to try to protect herself by obtaining her own recorder and recording the conversations. Bagwell found and destroyed all the tapes that she had made except for one. In that tape, Mrs. Bagwell was wanting to buy a gift for her niece’s housewarming party. Bagwell refused to allow this. Mrs. Bagwell read to Bagwell from the Bible concerning the passage on turning the other cheek. He got mad, tore the Bible up, hit Mrs. Bagwell and threatened to kill her.
Henry Patterson, a fellow Mason with Bagwell, observed black and blue marks on Mrs. Bagwell’s wrist, face and jaw on two different occasions. He also heard Bag-well curse at his wife. Patterson became concerned and tried to discuss the situation with Bagwell. Bagwell responded that “he had to do her that way to keep her in line.”
Dorothy Rhodes, Mrs. Bagwell’s niece, and her husband Phillip, testified that Bag-well consistently called Mrs. Bagwell a “crazy old bitch” and stated that she was useless, wore out and stupid. Bagwell was fond of shaking Mrs. Bagwell like a child while in their presence. Mrs. Bagwell came to their residence five times after beatings. Bagwell once informed Phillip that he believed he could drive Mrs. Bag-well into committing suicide; he had already driven her crazy. On one occasion, Dorothy, while working as a secretary for Bagwell Pest Control, observed Bagwell curse out Mrs. Bagwell for buying him a recliner for Father’s Day. Bagwell forced the delivery man to take it back to the store.
James Hayes, Mrs. Bagwell’s brother, testified that he observed his sister with black eyes, bruised face, skinned up legs and a bruised arm. Mrs. Bagwell told him how she got hurt. Hayes went to talk to Bagwell. Bagwell said that it was his private business and that he didn’t want to share his earnings with Mrs. Bagwell.
In 1984, Mrs. Bagwell contemplated suicide. After writing a suicide note, she obtained Bagwell’s service revolver (Bag-well had served part-time with the Bossier City Police Department). Bagwell always kept his gun loaded. The gun went off and the shot went into a wall. Mrs. Bagwell decided against suicide and went to sleep, leaving a note on the coffee table. When Bagwell came home, he picked up the note and kept it. He told Mrs. Bagwell to leave his gun alone because it had a hair trigger. According to the attorney handling Bag-well’s divorce, Bagwell gave him the suicide note during the summer of 1985. The parties separated in the summer of 1985.
After one of the court proceedings in the Bagwells’ divorce matter, Mrs. Bagwell *878 made arrangements to go to her former residence and trade some of Bagwell’s guns for some of her belongings.
On Saturday morning, Mrs. Bagwell got Bagwell’s service revolver. She decided to return just one gun so that she could use the remaining guns in barter for the court-ordered temporary alimony. She testified that she loaded the gun before taking it to Bagwell because that is the way he kept his gun and he would start arguing and become angry if it wasn’t returned just as he kept it. She put the gun in her purse in order to keep it from getting tossed around in the car.
Upon arriving at her former residence, Mrs. Bagwell parked her car and walked to the kitchen. The back door was unlocked and she called for Bagwell. Bagwell told her to come in. Mrs. Bagwell went through her home and into the hallway leading into the bathroom. Bagwell was sitting on the commode with his pants down. “Did you bring my damned gun?” “Here is your gun,” Mrs. Bagwell said as she laid the gun on the cabinet in the bathroom. “Where is (sic) the rest of them?” “I’ll bring those later; you’ll get your guns.”
Mrs. Bagwell testified that she left and went to the living room with her purse in her hand. She heard the commode flush and went back to the bathroom door. Her purse was still in her hand.
Mr. Bagwell was standing between the bathtub and commode facing Mrs. Bagwell and holding his pants up; He flushed the toilet again because the toilet didn’t work well. Bagwell sat down on the tub waiting for the toilet to refill. His left side was to Mrs. Bagwell because his legs were too long to fit between the toilet and tub, forcing him to sit on the tub at an angle with his legs extended to his right.
“I’ve got you where I want you now. I’ve got that note and I’ve got your fingerprints on that gun.” Bagwell started for the gun but Mrs. Bagwell grabbed it first and shot. Mrs. Bagwell could remember shooting only one time at this point. Bag-well started to get up and fell into the tub. He got up and walked to the end of the tub and started to get out of the tub when he fell to the bathroom floor.
Mrs. Bagwell walked to the kitchen, walking back and forth wondering if she should kill herself. She went into the dining room and shot herself over her left breast.
Mrs. Bagwell walked back to where Bag-well was pulling himself along the floor. Bagwell reached and Mrs. Bagwell tripped and fell on her back and dropped the gun. She sat up, scooted back as quickly as possible, grabbed the gun and shot him again.
Mrs. Bagwell sat back down, feeling dizzy and no longer able to see. She crawled up to the .couch and pulled herself up and walked into the kitchen where she blacked out. When she awakened, she crawled upon a stool in the kitchen and tried to call the Fire Department. However, she kept blacking out. She was finally able to call her mother and tell her that she had shot Jim and herself. Her mother became hysterical and Mrs. Bagwell hung up.
Mrs. Bagwell kept falling, but managed to go and see about Bagwell. He was pleading for her to help him. She tried to shoot herself again, but the gun was out of bullets.
Mrs. Bagwell went back into the kitchen but couldn’t see well enough to call the Fire Department. Somehow, she managed to call the Fire Department, but she was no longer sure what she said to them.
The Bossier City Fire Department received a call from 1001 Delhi Street on August 3, 1985 at approximately 9:00 a.m.
Detective James Viola of the Bossier City Police Department received an emergency call at approximately 9:00 a.m. on August 3, 1985. The call stated that there was a known shooting at 1001 Delhi and the suspect was in the residence. Detective Viola happened to be on Delhi Street, very near the house, at the moment he received the call. When he arrived at the residence, he was met by Ms. Pittman who informed him that the back door was open.
*879 Ms. Pittman had received a call from her grandmother, Mrs. Bagwell’s mother. When she ran to Mrs. Bagwell’s home, she saw Officer Viola. Ms. Pittman was the first to go through the back door. Mrs. Bagwell was sitting on the floor, crying and saying “He made me do it, I didn’t mean to do it.” Ms. Pittman went to Mrs. Bagwell, took her hand, and told her that everything would be okay. Mrs. Bagwell responded, “It hurts, I wish I was dead.”
When Detective Viola first saw Mrs. Bagwell, he thought that she was the deceased victim. He went to check on her and at the same time was looking for a suspect. Mrs. Bagwell raised her head and said, “I want to die, I want to die. I shot my husband. I don’t want to go to jail. Give me something for pain.”
The Fire Department arrived at this time. Captain Bill Winkler was among the first to come in the house. Detective Viola obtained the services of Captain Winkler in helping to secure the scene. The weapon was located approximately 20 feet from the body. Detective Viola informed the firemen not to move anything except Mrs. Bagwell. Bagwell was lying in the hallway leading to the bathroom. His pants were at or slightly above his knees. A newspaper was lying in the bathtub and fecal matter was in the toilet.
The Bossier City Police Department collected several items of evidence from the residence. The gun was recovered and found to contain five spent rounds and one empty chamber. A white mesh purse was located on a table. There was one bullet hole in the purse. One bullet was recovered from a living room wall where it had passed through a picture. Another bullet was located on the ledge of the bathtub. Bullet fragments were found in the bathtub and on the back of Bagwell. A newspaper was located in the bathtub.
While the identification team was collecting evidence, Detective George West went to the LSUMC Hospital emergency room where Mrs. Bagwell was being attended by a physician. The officers identified themselves as police when they entered the room. Mrs. Bagwell stated, “I missed my heart, I killed my husband; I can’t believe I missed my heart.” The officers gave the standard Miranda warnings to Mrs. Bag-well. She stated that she wanted an attorney and the officers left.
Dr. George McCormick performed the autopsy for the State. There are four separate wounds which were caused by at least three separate shots. Wound No. 1 is to the upper left arm. The angle of the bullet is from left to right and towards the back. A review of the photographs indicates that the entrance of this wound is slightly on the tricep side of the arm as opposed to the direct middle of the arm. According to Dr. McCormick, this could fit in with either the second or third wound.
The second wound entered the chest on the left side and passed through the liver, heart and diaphragm. The bullet angled slightly down while going from left to right and angled slightly forward.
Wound No. 3 also entered on the left side of the chest through the lower ribs, diaphragm, abdomen, small intestine, pancreas and inferior vena cava. The path of the bullet was also from left to right, slightly down and from front to back.
The fourth wound entered Mr. Bagwell’s right thigh from the back and exited the front.
Dr. McCormick found a pattern of linear abrasions on the left side of Mr. Bagwell’s back. This was caused by lead and porcelain fragments. One bullet struck the tub near the top and along the side next to the back wall. This indicated that Mr. Bagwell was face down in the tub with his head towards the drain when the bullet hit the tub.
Terry Franklin of the North Louisiana Crime Laboratory testified that four bullets were recovered. Two bullets came from the body of Mr. Bagwell, one from the wall in the living room and one from the ledge of the bathtub.
The purse recovered at the crime scene has one bullet hole through the bottom. Inside the purse are black soot deposits caused by residues from the burned gunpowder. These residues are consistent *880 with the gun being fired from inside of the purse. The soot pattern is also consistent with soot escaping from between the cylinder and the barrel. A second pattern from inside the purse indicated to Franklin that two shots may have been fired from inside the purse.
An examination of the newspaper recovered from the bathtub revealed three minute lead particles and lead residue. The residue on the paper was consistent with a shot being fired from three feet or less, even considering that the shot was fired from inside her purse. No soot was found on the contents of the purse.
Bagwell’s boxer shorts and pants were also examined. Lead residue was discovered on the pants and shorts. The shorts had one bullet hole and the pants had three holes. According to Franklin, the three holes in the pants could possibly have been caused by one bullet passing through the pants as they were bunched up around Bagwell’s legs.
The defense expert was Dr. Vincent DiMaio, the chief medical examiner for Byaer (sic) (Bexar) Medical Examiner’s Office, San Antonio, Texas. Dr. DiMaio is also the author of the book “Gunshot Wounds, Practical Aspect of Firearms, Ballistics and Forensic Techniques,” 1985. In addition to other qualifications, Dr. DiMaio has been professor at the Department of Pathology of the University of Texas and a consultant to the Department of Pathology of the University of Baylor Medical Center. He has also taught classes on gunshot wounds at the Armed Forces Institute of Pathology and is a consultant to the Department of Pathology at Brook Army Medical Center.
Dr. DiMaio concluded that only one shot was fired through the purse. The markings in the purse were consistent with the gun having been fired while holding the gun with two hands and the purse with one.
The newspaper was hit by two or more lead fragments, not by a bullet. The damage to the newspaper was consistent with the paper being in the tub at the time that the bullet hit the tub and disintegrated.
The bullet found on the ledge of the bathtub had caused the No. 4 wound to Bagwell. Dr. DiMaio agreed with Dr. McCormick that this bullet had passed through the back of the defendant’s leg and out the front of his leg and through his pants.
According to Dr. DiMaio, the wounds and other physical evidence were consistent with the following scenario: Bagwell was sitting on the tub, rising and reaching when the first shot was fired. This shot went through Bagwell’s arm and into his side. Bagwell would have been sitting on the edge of the tub with his left side exposed toward Mrs. Bagwell. Bagwell would have been sitting in this position because there was not enough room in between the tub and the toilet for him to sit facing the bathroom door as his legs were too long to fit between the bathtub and toilet. After the first shot, Bagwell rotates to his right and falls into the tub. A second shot is fired and hits the rear of his leg and exits the front of his pants. This bullet was eventually found on the bathtub ledge. A third shot hits the tub while Bagwell is lying in the tub and disintegrates. The lead fragments from the disintegrating bullet caused superficial wounds on Bagwell’s back and on the newspaper. The fourth shot is into Mrs. Bagwell’s shoulder. A fifth shot occurs in the hall as Bagwell is rising from the floor and exposing his left side towards Mrs. Bagwell.
By way of rebuttal, over defense objection that it was improper rebuttal, the state presented the testimony of Ray Herd, director of the North Louisiana Criminalis-tics Laboratory and Franklin’s superior. Herd offered opinions designed to support those of Franklin, added new opinions, and recited what purported to be new facts— lead vapor on the newspaper held by Bag-well and finding a few particles of unburned gunpowder on the newspaper.
Herd added the opinion that the revolver was upright inside the purse when fired once and was then pushed forward through the purse and fired again; that the damage to the purse was inconsistent with any in *881 nocent explanation; that the revolver was about 12 inches from the newspaper held by Bagwell when fired; and the bullet that went through the newspaper left a neat round hole consistent with the newspaper being held out in the open and not up against anything. In other words, this was testimony directed at discharging the state’s burden of proving that Mrs. Bag-well did not act in self-defense.
The defendant’s effort to call Dr. DiMaio in surrebuttal to refute the testimony of Herd was denied by the trial court. In response to the foregoing, the defendant has filed, as Assignments of Error Nos. 4 and 5, the following:
“The trial court erred in allowing the State to call Ray Herd as a witness on rebuttal.”
“The trial court erred in refusing to allow the Defendant to call Dr. Vincent DiMaio on surrebuttal.”
La. R.S. 15:282 provides:
The prosecution has the right to rebut the evidence adduced by the defendant, but the defendant is without the right to rebut the prosecution’s rebuttal.
Rebuttal evidence is that offered to explain, repel, counteract, or disprove facts given in evidence by the adverse party. State v. Turner, 337 So.2d 455 (La.1976); State v. Monroe, 205 La. 285, 17 So.2d 331 (1944).
It is well settled that the prosecution cannot present on rebuttal facts that should have been introduced in the case-in-chief. See Pugh and McClelland, Work of the Appellate Courts, 1974-1975, 36 La.L. Rev. 651, 661; Lamonica, Work of the Appellate Courts, 1976-1977, 38 La.L.Rev. 516, 575.
We held in State v. Dayton, 445 So.2d 76 (La.App. 2d Cir.1984) that rebuttal of opinion evidence rather than facts was improper rebuttal and was reversible error.
It was explained in Turner, supra, that two types of prejudice can occur as the result of improper rebuttal. In the first the defendant is deprived of the right to defend against new issues. This type of prejudice may be cured by surrebuttal. See State v. Jackson, 482 So.2d 807 (La.App. 4th Cir.1986). The second type of prejudice, often incurable, occurs when the production of strong evidence in rebuttal unfairly emphasizes the prosecution’s evidence. For example, in State v. Davis, 246 La. 383, 164 So.2d 589 (1964), reversible error was found when the trial judge allowed two deputies, in rebuttal, to substantially repeat what they had testified to during the state’s case-in-chief. This was deemed, not proper rebuttal testimony, but merely a repetition of negative testimony given in the case-in-chief.
Both types of prejudice occurred in our case. Herd testified to new facts which the defendant was not given the opportunity to refute in surrebuttal. In addition, Herd simply repeated opinions that had been given by the prosecution’s expert, Franklin, in the case-in-chief. As a consequence, undue weight was given to the negative testimony offered by the state in discharge of its burden to prove that Mrs. Bagwell did not act in self-defense in shooting her husband. This was reversible error.

Decree

For the reasons set forth, the defendant’s conviction is reversed and the sentence is set aside; the case is remanded to the trial court for retrial, in accordance with law.