582 So.2d 1374 (1991)
STATE of Louisiana, Appellee,
v.
Bryan Wayne WIDENHOUSE, Appellant.
No. 22525-KA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 1991.
Rehearing Denied July 24, 1991.
*1377 Mills, Timmons & Flowers by Peter Flowers, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, James M. Bullers, Dist. Atty., Minden, for appellee.
Before NORRIS, VICTORY and STEWART, JJ.
VICTORY, Judge.
In this appeal from his conviction by a unanimous jury of second degree murder, defendant Bryan Wayne Widenhouse seeks to overturn his conviction, presenting eight arguments encompassing nineteen assignments of error.[1] Specifically, defendant contends his confession was improperly replayed to the jury in rebuttal, juror challenges for cause were improperly denied, a state psychiatric witness was improperly allowed to discuss the law of insanity and to mention defendant's refusal to talk to him, the trial court prevented him from effectively presenting a defense, and the evidence was insufficient to sustain the finding of guilty or to overcome the insanity defense presented.
Finding no reversible error for reasons hereinafter assigned, we affirm defendant's conviction and sentence.

FACTS
This case involves the August 15, 1989 murder of 17-year-old Bramante "Monty" Smith by defendant Widenhouse and Frank Dwayne Moseley, who were also 17 years old. Defendant Widenhouse and Moseley were tried and convicted of second degree murder in separate proceedings.[2]
The basic facts leading up to their crime and subsequent convictions are not disputed. On August 14, 1989 the victim, Monty Smith, was questioned by Bossier Parish law enforcement authorities about a series of burglaries and thefts that had been committed in Bossier Parish. Smith implicated defendant Widenhouse and Moseley, telling Bossier Parish sheriff deputies they had committed thefts and burglaries in the parish and were storing stolen property at the Moseley home, where both defendant Widenhouse and Moseley were living.
Law enforcement authorities, having been told by Smith that he had only helped plan some of the crimes, secretly believed Smith had actively participated in the crimes but refused to admit it. Authorities, not wanting Smith to "tip" Widenhouse and Moseley off to their investigation, requested and Smith agreed to wear a radio transmitting device and go to the Moseley home to look for stolen items. Sheriff deputies were looking particularly for an H & K assault rifle which Smith had informed them was stolen in one of the crimes.
That day, law enforcement authorities dropped Smith near the home where defendant and Moseley lived to retrieve the stolen rifle. While there, Smith asked defendant and Moseley if he could borrow the rifle, promising to return it the next day. The defendant and Moseley told Smith the weapon was hidden in the woods and asked him to return the next day when they would retrieve the rifle.
The next day, August 15, Smith again met with Bossier Parish sheriff deputies, who again attached a radio transmitter to him and took him to meet with defendant and Moseley at their residence. The transmissions were covertly monitored and recorded by one deputy maintaining surveillance near the home.
After briefly talking inside, the three young men left the home together in a vehicle driven by defendant Widenhouse. As he was being followed, defendant Widenhouse apparently (but perhaps unwittingly) performed a counter-surveillance maneuver which caused the trailing undercover deputy to lose sight of and radio contact *1378 with them. The deputy then radioed for help and began looking for the vehicle.
Some 45 to 110 minutes later, defendant's vehicle was spotted by a patrol officer, who stopped the vehicle. Its only occupants then were the defendant and Moseley. Shortly after the defendant and Moseley were given their Miranda rights, the parish deputy in charge of surveillance arrived and questioned them.
Both defendant and Moseley initially denied the victim had been with them. When confronted with the deputy's knowledge that they were all together, however, they changed their story, telling the officer they had all been shooting in the woods but that on their way to football practice, they dropped Smith off on Sligo-Caplis Road in Bossier City. Smith, they claimed, had a lot of money and was on his way to Florida.
Two rifles were visible in the car. Defendant and Moseley allowed the patrol officer to see and run a check on the weapons. Since the rifles had not been reported as stolen, the weapons were not seized. After further questioning, defendant Widenhouse and Moseley were allowed to go to football practice. Meanwhile, parish deputies continued their search for Smith.
When Moseley and defendant Widenhouse were again questioned later that afternoon during football practice, they admitted to authorities their participation in the burglaries. They then went with sheriff deputies to the Moseley home, where the stolen property was retrieved. Still unaware Smith had been killed, the authorities released the youths, but asked them to report to the police station the following morning.
The next morning, August 16, defendant, Moseley and several others met at the sheriff's office. Before talking to them, deputies spoke with one of boys' father, who had overheard the young men talking about killing Smith one week earlier. Initially thinking Widenhouse and Moseley were joking, the father informed police of his concern that Smith was still missing and his belief their threats had been carried out.
After again giving defendant and Moseley their Miranda rights, law enforcement authorities decided to interrogate the youths again about Smith's whereabouts. Moseley, questioned first, confessed to the killing and later took the deputies to Smith's body. Armed with Moseley's confession, deputies then questioned defendant Widenhouse, who admitted his participation in the murder and detailed the events of the previous three days.
Smith's body, riddled with numerous bullet wounds, was found in a densely wooded area near Taylortown. Four of the bullet wounds were consistent with the .38 caliber revolver admittedly carried by defendant to the scene on the day of the murder.
On August 28, 1989, defendant Widenhouse entered a combined plea of not guilty and not guilty by reason of insanity. Seeking to suppress certain physical evidence and oral and recorded inculpatory statements he had given to police on August 16 and inculpatory statements he had made to school friends, defendant filed various motions to suppress, which the trial court denied after an evidentiary hearing.
As jury selection began on February 26, 1990, defendant again sought to suppress his August 16 confession, claiming it was coerced or, alternatively, involuntarily given as a result of defendant's claimed mental illness. This motion was denied without an additional hearing.
At trial, defendant was convicted by unanimous verdict of second degree murder and later sentenced to a mandatory term of life in prison at hard labor without benefit of probation, parole, or suspension of sentence.

ASSIGNMENTS OF ERROR
Defendant formally made 66 assignments of error, 47 of which have been expressly abandoned in brief. At issue herein are the following assigned and briefed errors:
1. Whether the trial court erred in denying the additional motion to suppress defendant's confession without first conducting an evidentiary hearing; (Assignment of Error No. 20).
*1379 2. Whether the trial court erred in refusing to excuse a potential juror challenged for cause on the grounds of inability to understand the presumption of innocence and the legal principles relevant to an insanity defense; (Assignment of Error No. 34).
3. Whether the trial court erred in refusing to excuse a potential juror challenged for cause on the grounds of having a spouse who worked with the victim's father; (Assignments of Error Nos. 35, 36 & 37).
4. Whether the trial court prevented the presentation of evidence deemed by defense counsel to be essential to understanding defendant's perceptions of the victim and the Dungeons and Dragons game, and witnesses' perceptions of defendant, so as to prevent defendant from effectively presenting a defense; (Assignments of Error Nos. 38, 54, 55 & 56).
5. Whether the trial court violated defendant's Fifth Amendment rights by allowing the prosecutor to question defendant's psychiatric witness about defendant's refusal to talk to the State's psychiatrist; (Assignments of Error, Nos. 45, 46, 47 & 49).
6. Whether the trial court erred in allowing one of the state's expert witness, a psychiatrist, to tell the jury how to define and apply the law on insanity; (Assignments of Error Nos. 59, 60 & 61).
7. Whether the trial court erred in allowing the replaying of defendant's confession during the state's rebuttal, to show defendant's emotional demeanor, when the jury had heard the tape in its entirety during the state's case-in-chief; (Assignments of Error Nos. 62 & 63).
8. Whether the evidence was sufficient to support the jury's unanimous determinations of guilt and defendant's sanity, despite conflicting medical testimony about his mental condition. (Supplemental Assignment of Error No. 66).

MOTION TO SUPPRESS

(Assignment of Error No. 20)
In this assignment, defendant contends the trial court erred in denying the additional motion to suppress defendant's confession without hearing. Filed on the first day of trial and based on psychiatric reports received by defense counsel after the first motion to suppress his confession had been heard and denied, defendant's motion claimed that due to defendant's alleged mental defects, including schizoid-avoidant personality, he was unable to knowingly, voluntarily and intelligently waive his Fifth Amendment right to remain silent.[3]
Although recognizing defendant's motion was untimely, the trial court allowed it to be filed over the prosecutor's objection. However, the trial court denied defendant's motion without a hearing, instead adopting and "predicating" his decision upon the testimony taken during defendant's prior motion to suppress hearings.
In making his ruling, the trial judge noted defendant filed the subject motion on February 26, 1990, the first day of trial, and that defendant's not guilty by reason of insanity plea had been entered for almost six months. It further noted that by the January 29, 1990 discovery request hearing, defense counsel had received all the reports from his expert witnesses but that he added another psychiatric defense witness during the week prior to February 22, 1990.
In determining whether the ruling on a motion to suppress a defendant's confession was correct, the reviewing court is not limited to the evidence adduced at the hearing on the motion, but may consider all pertinent evidence given at the trial of the case. LSA-R.S. 15:451; State v. Seward, 509 So.2d 413, 416 n. 8 (La.1987); State v. *1380 Fisher, 380 So.2d 1340, 1343 n. 1 (La.1980); State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La.1979); State v. Schmidt, 359 So.2d 133, 134 n. 2 (La.1978). When insanity is the basis of a motion to suppress a confession, the state must prove that defendant had the mental capacity to waive his right against self-incrimination. LSA-C.Cr.P. Art. 703 D; State v. Trudell, 350 So.2d 658 (La.1977). Great weight is accorded to the trial court's determination of whether the state has satisfied its burden of proof. State v. Thompson, 429 So.2d 862, 865 (La.1983); State v. Coleman, 395 So.2d 704 (La.1981).
Defendant emphasizes in brief the trial court's failure to hold an evidentiary hearing on his motion. He argues he was at least entitled to, but was denied, a hearing on his motion at which the state was required to again present witnesses and evidence showing defendant's confession was voluntary.
We first note that defense counsel, in oral argument here, candidly admitted he did not want to put on any evidence in support of his third motion to suppress and that he then had no witnesses present to put on the required suppression evidence. Defense counsel further admitted he expected (or at least hoped) the trial court would continue the trial and hold a hearing at a later date on defendant's suppression motion.
Further, the cases cited by defendant State v. Rogers, 476 So.2d 942 (La.App. 2d Cir.1985), quoting Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); State v. Thompson, supra; State v. Hills, 354 So.2d 186 (La.1977)do not stand for defense counsel's proposition that the state had to present witnesses anew to prove defendant did not suffer a mental abnormality which negated his ability to intelligently and knowingly waive his right to remain silent. The only case cited by defendant dealing with the insanity issue is Thompson, which did not discuss the possibility of the presumption of sanity as being able to meet the state's burden. See LSA-R.S. 15:432.
The prosecuting attorney is not required to present evidence at a suppression hearing. Instead, he may rely on the presumption of sanity, leaving to defendant the burden to prove the existence of a mental abnormality which, under the limited circumstances, may have destroyed the voluntary nature of his confession. LSA-R.S. 15:432; State v. Golmon, 536 So.2d 481 (La.App. 1st Cir.1988), cert. denied, ___ U.S. ____, 110 S.Ct. 104, 107 L.Ed.2d 67 (1989). If the defendant fails to prove the existence of a mental disease or defect or that such disorder prevented his confession from being voluntary, the state need not negate defendant's alleged mental abnormality; but it must in all other respects prove beyond a reasonable doubt that the confession was voluntary. State v. Golmon, supra, at 487; State v. Waymire, 504 So.2d 953, 958 (La.App. 1st Cir.1987) and cases therein cited.
The evidence adopted by the trial court in determining defendant's confession was made freely and voluntarily and not influenced by fear, duress, intimidation, menaces, threats or promises included the prior testimony of several deputies and the defendant as well as defendant's detailed confession itself. The first suppression hearing dealt with the traditional analysis of whether defendant knowingly and voluntarily waived his right to remain silent when the confession was given and the other inculpatory statements were made.
Detective Padgett testified that the first thing he did was advise defendant of his constitutional rights. To him, defendant appeared and acted alert and oriented and appeared to understand what was happening that August 15 afternoon in the coach's office. He further stated defendant was in the same condition on August 16 and he then understood the purpose of their meeting and what was being done.
Detective Padgett's testimony is corroborated by that of Deputy Luce, who testified defendant gave no indication on August 15 that he did not understand and he did not appear to be under the influence of anything.
*1381 Defendant testified he was "kind of scared" in the coach's office and felt he had to answer questions. Defendant stated that because he believes authority figures, he "would have signed anything they told me to sign." Defendant, however, admitted he had been advised of his rights on August 15 both at the traffic stop and in the coach's office. In fact, he was able to recite the Miranda warning from memory.
Additionally, defendant further stated he "wasn't listening" to the rights advice given to him on August 16 when he made his confession. He also claimed that Detective Cowen impliedly promised to obtain dismissal of charges if defendant cooperated.
Detective Cowen testified on rebuttal he made no promises to defendant and made no statement that charges would be dropped; he merely said he would "help" by being available if defendant wanted to talk.
The psychiatric evidence adduced at trial was in conflict. Defendant's witnesses opined that he was delusional, suffering from a schizoid personality disorder. The state's psychiatric witness opined that defendant was malingering, giving inconsistent answers and feigning mental illness.
Under the circumstances presented here, the preponderance of defendant's evidence presented at the former suppression hearing did not convince the trial court his statements were given in violation of his Fifth Amendment rights. Neither did defendant's evidence at trial persuade the jury that he was incapable of distinguishing right from wrong at the time of the offense.
Considering the presumption of sanity and the testimony elicited during prior suppression hearings, and giving great weight to the fact finders' determination, we find the evidence failed to show the voluntariness of defendant's confession was destroyed by a mental abnormality or defect. The state's evidence provided a sufficient basis for the trial court's finding that defendant was able to knowingly and intelligently waive his right to remain silent, to comprehend the meaning of his confession, and that defendant's confession was freely and voluntarily made. This assignment is without merit.

JUROR CHALLENGES

(Assignments of Error Nos. 34, 35, 36 & 37)
Defendant next challenges certain trial court rulings concerning jury selection. In these assignments, defendant contends the trial court erred in failing to excuse two prospective jurors he challenged for cause.
Assignment of Error No. 34:
Defendant first contends the trial court erred in refusing to excuse a potential juror, Mr. Washington, who defendant challenged for cause based upon the venireman's alleged inability to understand the presumption of innocence and the legal principles relevant to the insanity defense and because he had preconceptions about defendant's guilt. Defendant emphasizes that there were several people remaining in the venire pool. Because the trial court refused to excuse this juror for cause, he claims, he was required to use a peremptory challenge, which then could not be used to remove other jurors whom defendant did not want serving on the panel.
The trial judge is vested with broad discretion in ruling on a challenge for cause and his ruling will not be disturbed on appeal absent a showing of abuse of that discretion. See e.g., State v. Sylvester, 400 So.2d 640, 643 (La.1981); State v. Cody, 446 So.2d 1278, 1286 (La. App. 2d Cir.1984). Only when it appears, upon review of the entire voir dire examination, that the judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will the court's ruling be reversed. Refusal to excuse for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where subsequently or on further inquiry or instruction, the juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. State v. Welcome, *1382 458 So.2d 1235 (La.1983); State v. Wilson, 469 So.2d 1087 (La.App. 2d Cir.1985), writ denied, 475 So.2d 778 (La.1985); State v. Mims, 524 So.2d 526, 533 (La.App. 2d Cir. 1988); State v. Murphy, 465 So.2d 811 (La.App. 2d Cir.1985).
Defendant cites State v. Hawkins, 376 So.2d 943, 950 (La.1979), for the proposition that
A defendant who pleads insanity as a defense is certainly entitled to have jurors who understand the burden of proof required to prove his plea of insanity at the time of the commission of the offense.
Hawkins presented the question of whether the trial court erred when it forbade all counsel from questioning prospective jurors concerning any principles of law. In finding reversible error, the court uttered the quoted judicial dicta. Our review indicates it is the only reported case to use this particular language. In any event, it is distinguishable on its facts. No such error occurred here.
The defendant argues the juror said he felt strongly that defendant "wouldn't be in court if he hadn't done something wrong" and that the juror did not understand the legal principles, burdens, and definitions applicable to defendant's pleas of not guilty and not guilty by reason of insanity.
Indeed, the record reflects the prospective juror at first just agreed with much of what he was told. Though apparently not well skilled in communication, and although he became somewhat confused by defense counsel's questioning, after the trial court instructed the juror on the applicable principles of law, the juror stated he understood the burden of the District Attorney and that defendant's burden was "not as great" and agreed to follow the law as instructed.
Further, although defense counsel's continued questioning tripped him up on what burdens were borne by whom, the juror was able to give rudimentary explanations of legal insanity. For example, the juror stated:
[DEFENSE COUNSEL]: Would you then tell me what my burden would be?
[PROSPECTIVE JUROR]: Your burden is to prove that [the defendant] was insane, that he wasn't able to know right from wrong when he committed this crime.
Record, at 1470.
Additionally, the prospective juror's voir dire as a whole shows he did not persist in his preconceived notion of guilt; rather, he accepted the state's burden to prove defendant's guilt beyond a reasonable doubt and agreed to follow the law as instructed. See LSA-C.Cr.P. Art. 797(2).
If a prospective juror is able, after examination by defense counsel, to declare to the court's reasonable satisfaction that he could render an impartial verdict according to the law and the evidence, it is the trial court's duty to deny a challenge for cause. State v. Claiborne, 397 So.2d 486, 489 (La.1981).
Moreover, our supreme court has repeatedly dismissed defense arguments that its challenge for cause was improperly denied where it appears that the prospective juror, when questioned further by the prosecutor and the court, demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. See e.g. State v. Ellwest Stereo Theaters, Inc., 412 So.2d 594 (La.1982); State v. McIntyre, 381 So.2d 408 (La.1980); State v. Allen, 380 So.2d 28 (La.1980); State v. Sonnier, 379 So.2d 1336 (La.1980); State v. Shelton, 377 So.2d 96 (La.1979).
The trial court found the juror's responses to be satisfactory. We find no manifest error in the trial court's conclusion. The trial court did not abuse its discretion in declining to grant defendant's challenge for cause concerning this juror.
Assignments of Error Nos. 35, 36 & 37:
Defendant further contends the trial court erred in refusing to excuse for cause another prospective juror whose spouse worked with the victim's father at a nursing home. On voir dire, the juror readily *1383 admitted his wife worked at the same place as the victim's father, who was employed there as a janitor. However, the juror did not know the victim's father personally and did not know how often his wife saw or spoke to him.
Further, the juror stated he would ignore the employment relationship during the course of the trial and that fact would not exert any pressure on him. The juror had no idea how the father would feel if defendant were not convicted.
Believing the prospective juror would be fair and impartial, the trial judge denied defendant's challenge for cause. Having exhausted his peremptory challenges, the juror served on the jury which ultimately convicted defendant.
Our law does not require a jury to be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney and the witnesses who may testify at trial. It requires only that jurors be fair and unbiased. State v. Shelton, supra, at 102. The mere existence of personal acquaintances between a prospective juror and the trial participants does not, without more, demonstrate a lack of fitness to serve as a juror. State v. Gray, 351 So.2d 448, 455 (La.1977). The existence per se of a relationship, even one of blood or marriage, is not sufficient to disqualify a juror unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. State v. Peterson, 446 So.2d 815, 818 (La.App. 2d Cir.1984).
The relationship here between the juror's spouse and the victim's father is tenuous at best. The record does not reflect that the juror's wife and the victim's father were friends or even that they conversed regularly. Further, the trial judge believed the juror's testimony that he could be fair and impartial. Under the circumstances, defendant has not shown an abuse of the trial court's discretion. Compare, State v. Walker, 577 So.2d 770 (La.App. 2d Cir.1991).[4]

IMPROPER RESTRAINT ON DEFENDANT'S DEFENSE

(Assignments of Error Nos. 38, 54, 55 & 56)
Defendant next contends the trial court erred in preventing him from presenting evidence claimed essential to the jury's understanding of defendant's theory of the case, which prevented him from effectively presenting a defense. At trial, defendant conceded the homicide, but claimed he had a delusional personality with a schizoid disorder and that this mental defect caused him to act out the role of a "Dungeon Master," a character from the game Dungeons and Dragons, and kill Smith in order to "rid the world of his evil." He further claimed his delusion, stemming from mental disease or defect, rendered him incapable of distinguishing right from wrong at the time of the killing.
In Assignment 38, defendant contends the trial court's ruling that defense counsel could not comment on or seek to introduce evidence about defendant's perception of the victim during opening statement or throughout the trial prevented him from putting on his defense.
Our review of the record reveals defense counsel misinterpreted the trial court's ruling. The trial court initially ruled counsel could not "slur the victim," but later allowed him to present evidence of defendant's perceptions of the victim through his medical experts. The court allowed, for example, a double hearsay statement of the victim's alleged threat to kill defendant. Further, Dr. Mark Vigen, one of defendant's psychiatric experts, testified at great length about defendant's perceptions of the victim.
Under LSA-C.E. Art. 404 A, a person's character usually must be proved by reputation, not specific acts. However, where a defendant's perception of his victim is caused by a mental defect rendering him insane, such acts may be admissible if their probative value is outweighed by the *1384 danger of unfair prejudice under the balancing test of LSA-C.E. Art. 403. See also LSA-C.E. Arts. 404 B(1) and 405 B. Since the defendant was allowed to present such evidence, no prejudice resulted from the trial court's initial ruling. Accordingly, this assignment is without merit.
Defendant also assigns as error the trial court's ruling disallowing his use of an exhibit listing medical symptoms. By this exhibit, defendant sought to determine whether the witnesses' observations of defendant were consistent with defendant's purported mental condition and to use it as a visual aid to assist his counsel while questioning lay witnesses. Defendant was prevented from showing the chart to a lay witness, Kenneth Jones, because to do so would be leading the witness. The trial court's ruling was correct.
Defendant also claims as error the trial court's refusal to allow a lay witness to testify about her perception of how Dungeons and Dragons affected her son. The record reflects the witness was not an expert. Further, the mere fact the game, in her opinion, affected her son that way has no relevance to how it affected the defendant. Moreover, the witness's child was not identified as a person who played Dungeons and Dragons with the defendant.
The common problem encountered by counsel in each of his examples is that he was trying to offer matters which were barred as irrelevant, constituted hearsay or improper character evidence, or were attempts to introduce evidence [e.g. defendant's family medical history] without proper foundation. A trial judge is vested with wide discretion in determining relevancy of evidence; his ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. State v. Sharp, 418 So.2d 1344 (La.1981); State v. Miles, 402 So.2d 644 (La.1981).
The trial court carefully evaluated each claim after lengthy arguments by counsel and determined what was relevant and admissible. We find no abuse of the trial court's discretion. It did not improperly restrain or prevent defendant from effectively presenting his defense.

FIFTH AMENDMENT RIGHTS

(Assignments of Error Nos. 45, 46, 47 & 49)
Defendant next contends his Fifth Amendment rights were violated by the trial court allowing: (1) the prosecutor to question Dr. Vigen about defendant's refusal to be examined while incarcerated and awaiting trial by the state's psychiatric expert, Dr. George Seiden; (2) Dr. Seiden to testify concerning defendant's refusal to be examined by him; and (3) the prosecutor to argue the defendant's refusal to talk to Dr. Seiden in closing arguments.
The record reflects that Dr. Vigen stated he did not give defendant any legal advice and would not tell him not to talk to the state's psychiatrist. In fact, the statements to which counsel objected do not even mention defendant. Rather, it was a general question: "Have you ever tried to examine someone in connection with a criminal proceeding and had them refuse to be examined?"
The record further shows Dr. Seiden merely stated the defendant refused to be examined by him as an explanation of why he could not be better informed concerning the sanity issue. No reference was made or implied concerning defendant's right to remain silent on any issue other than the insanity defense.
The prosecutor's only comment during closing argument about defendant's refusal to submit to the state's court-ordered psychiatric examination did not refer to defendant's right to remain silent and was presented as rebuttal to defendant's psychiatric witness's testimony.
In Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held a state statute violated the Fifth Amendment by allowing a direct comment on an accused's failure to testify because it created a rule of evidence permitting an inference of guilt to be drawn from the silence.
In Wainright v. Greenfield, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), *1385 the prosecutor argued that defendant's silence after receiving Miranda warnings was evidence of his sanity. The Supreme Court held that the use of defendant's post-arrest silence as evidence of his sanity violated due process. The court found no distinction between the use of such comments during the state's case-in-chief or in rebuttal, or between use on the merits of the crime or for attacking a sanity defense.
The rationale of these cases rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial. South Dakota v. Neville, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). Accord, Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (use for impeachment purposes of a defendant's silence, after receipt of Miranda warnings, is a violation of the due process clause of the 14th Amendment).
There are two tests for determining whether a prosecutor's remarks constitute comment on a defendant's silence in violation of Doyle and its progeny. These are (1) whether the manifest intent was to comment on defendant's silence, and (2) whether the character of the remark was such that the jury naturally and necessarily would construe it as a comment on defendant's silence. United States v. Shaw, 701 F.2d 367, 381 (5th Cir.1983), cert. denied, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984).
However, a defendant's Fifth Amendment rights are affected by his plea of not guilty by reason of insanity. While an accused who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence may not be compelled to respond to a psychiatrist if his statements can be used against him in either the guilt or penalty phases of his trial, where a defendant expressly puts his sanity in issue, the state may request and the trial court may order defendant to be examined by an independent mental health professional to determine his sanity at the time of the offense. See LSA-C.Cr.P. Art. 646; see also and compare Estelle v. Smith, 451 U.S. 454, 466-469, 101 S.Ct. 1866, 1875-1876, 68 L.Ed.2d 359 (1981) and cases therein cited.
Here, the defendant's sanity was the central issue of the case. There was no comment on defendant's failure to testify. The testimony and comments were directed exclusively to defendant's failure to submit to a court-ordered psychiatric examination as an explanation of why the state's expert witness was not as well prepared as those testifying for defendant.
Contrary to defendant's contention in brief that the trial court prevented the admission of medical testimony that defendant's refusal to talk with Dr. Seiden was consistent with defendant's mental illness, the record shows the defendant's expert witness was allowed to give his opinion of why defendant refused to be examined. Accordingly, these assignments are meritless.

LIMITS OF EXPERT TESTIMONY

(Assignments of Error Nos. 59, 60 & 61)
Defendant alternatively contends the trial court erred in allowing the state's psychiatric witness, Dr. Seiden, during rebuttal: (1) to tell the jury how to apply the insanity law; (2) to inform the jury the legal standard of insanity law; and (3) to state his opinion that defendant's psychiatric witnesses applied the wrong legal standards.
The record reflects Dr. Seiden's professional qualifications include a teaching position at LSU Medical Center in Shreveport, where he teaches forensic psychiatry, the interaction of psychiatry with the law. Before any of the challenged testimony occurred, the trial judge made it clear that he would instruct the jury on the law to be applied to the case and repeated that advice during the testimony. The trial judge also instructed the jury at the end of the challenged testimony as to the legal insanity standard to be applied to the case.
In State v. James, 459 So.2d 1299 (La. App. 1st Cir.1984), writ denied, 463 So.2d 600, the court found that there was no error in allowing a forensic psychiatrist *1386 who taught forensics to testify about the differences in the applicable Louisiana standard and the federal standard for insanity. The court reasoned such testimony may have helped to promote a proper understanding of the legal test involved and of the basis for the doctor's decision. The court found the testimony did not exceed the expertise of the witness and his discussion did not prejudice defendant's case. State v. James, supra, at 1312.
The same reasoning applies here mandating the same result. Dr. Seiden did not "tell the jury how to apply the insanity law." He described the different legal standards for determining sanity. The trial court did not abuse its discretion in allowing the testimony to be presented. The testimony aided the jury's understanding of the basis for the experts' opinions, and helped the jury understand that they had to decide the question of defendant's sanity under Louisiana law rather than making a medical determination. The trial court's instructions at the time of the challenged testimony assured no prejudice to defendant's case.

IMPROPER REBUTTAL

(Assignments of Error Nos. 62 & 63)
Defendant additionally assigns as error the trial court's overruling his objection and allowing the state to replay in its entirety defendant's tape recorded confession during rebuttal. The record reflects defendant's recorded statement was played in its entirety during the state's case-in-chief while the jurors followed with copies of the transcript. Implicitly, its purpose then was to establish defendant's guilt.
After defendant had presented evidence of his insanity through expert and lay testimony, and desiring to rebut Dr. Vigen's testimony that people suffering from defendant's condition would lack emotional display, the prosecutor stated at trial he wanted to replay the tape for the jurors (without them having copies of the transcript) to hear "the emotional contents of [defendant's] statements and the manner in which he gave them." Defense counsel's objection before the tape was replayed emphasized the unfairness and prejudice to the defendant. The trial court overruled counsel's objection.
After the 25-minute recording had played for a few minutes, defense counsel interrupted the tape and again objected, arguing the jury had heard enough to establish that defendant was emotionally distraught during his confession and that continuing to play the tape served no purpose except to let the jury hear the confession again. The court allowed the tape to be replayed in its entirety.
Defendant argues here his demeanor at the time of the confession was never in dispute and that replaying the tape to show his demeanor was highly prejudicial and unwarranted.
Rebuttal evidence is that which is offered to explain, repel, counteract, or disprove facts given in evidence by the adverse party. In criminal cases, such evidence may be used to strengthen the state's original case. The determination of whether evidence is rebuttal evidence and hence admissible is an issue which is addressed to the sound discretion of the trial court judge. State v. Huizar, 414 So.2d 741, 751 (La.1982); State v. Bagwell, 519 So.2d 875, 881 (La.App. 2d Cir.1988); State v. Dayton, 445 So.2d 76, 78 (La.App. 2d Cir.1984).
In Bagwell, this court found reversible error when the state's rebuttal witness repeated opinions expressed by an expert witness during the case-in-chief, thereby giving undue weight to that testimony. In Dayton, this court additionally stated that rebuttal evidence is evidence which has become relevant or important only as an effect of some evidence introduced by the other side.
Both Bagwell and Dayton condemned the presentation of evidence during rebuttal which should have been presented during the state's case-in-chief. Here, however, the issue of defendant's demeanor at the time of his confession and its relation to his mental condition was not raised until Dr. Vigen opined that a person *1387 suffering from his diagnosed condition would not show emotion.
Since the defendant presented testimony that one with his disorder would be calm, cool and aloof, the trial court did not abuse its discretion in allowing the state to rebut the expert testimony by replaying defendant's confession.

SUFFICIENCY OF EVIDENCE

(Assignment of Error No. 66)
In this final assignment, defendant contends there was insufficient evidence to support the jury's determination that he was sane at the time of the offense. Defendant further contends he carried his burden of establishing the defense of insanity by a preponderance of the evidence.
In Louisiana, a defendant is presumed to be sane and the state is not required to prove his sanity. LSA-R.S. 15:432. A defendant who wishes to negate the presumption must put forth the affirmative defense of insanity and prove his insanity by a preponderance of the evidence. LSA-C.Cr.P. Art. 652; State v. Claibon, 395 So.2d 770 (La.1981); State v. Roy, 395 So.2d 664 (La.1981). The defendant must show that he suffered from a mental disease or defect which rendered him incapable of distinguishing right from wrong with reference to the conduct in question. LSA-R.S. 14:14; State v. Roy, supra.
On appeal, the relevant inquiry by a reviewing court is whether the defendant adduced evidence of his insanity at the time of the offense such that any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Claibon, supra; State v. Roy, supra. This determination is made after reviewing all of the evidence contained within the record, including expert and lay testimony. State v. Claibon, supra; State v. Pettaway, 450 So.2d 1345, 1353 (La.App. 2d Cir.1984), writ denied, 456 So.2d 171.
In support of his insanity plea, defendant presented the testimony of several lay and expert witnesses. Dr. Vigen, a psychologist, discussed in great detail three interviews he had with defendant and the result of various psychological tests given to defendant. According to him, defendant's MMPI profile showed some indications defendant had a mental disease or defect. He noted, however, the results reflected some exaggeration of symptoms. Although defendant's test profile predicted a stormy, chaotic life and features of a thought disorder, Dr. Vigen opined those characteristics were not present in defendant.
On the Rorshach (Ink Blot) test, defendant gave six of ten normal responses. One unacceptable response was defendant's viewing a blot as a panther. Dr. Vigen explained this response, however, noting the mascot of defendant's school is a panther.
Although defense experts found defendant did not suffer delusions or hallucinations, the evidence reflects defendant told the doctor that he had been chased by a UFO and had hallucinated a truck jack-knifing in the road.
Defendant's expert evidence additionally sought to establish:
Defendant does all the right things and controls himself, but lives in a dream world, a fantasy world.
Defendant was obsessed with playing Dungeons and Dragons.
Defendant had been pressured by the victim to lend him a shotgun, but this is not consistent with testimony indicating defendant is a strong leader who is always in control.
Defendant was reluctant to lend the shotgun to the victim because he felt Smith wanted to use it in a drive-by shooting, which is inconsistent with defense witness's conclusion that defendant was unable to distinguish right from wrong.
During an interview on October 4, 1989, defendant was worried about the doctor's *1388 interpretation of him because defendant knew it could make a difference between freedom and prison. This became even more interesting when the state's expert witness testified on rebuttal there were indications defendant was "malingering" and feigning symptoms.
Even Dr. Vigen agreed there was some evidence indicating defendant was trying to manipulate the MMPI score. He testified that other internal checks indicated to him that defendant's test results were valid.
Dr. Vigen further explained:
There is no scientific proof of a causal relation from Dungeons and Dragons to violence.
Defendant had planned various scenarios to kill victim for a week preceding the crime.
Defendant avoided speeding from the scene of the homicide because he knew speeding was wrong and did not want to get caught.
One can have a severe mental disorder and still distinguish right from wrong.
Dr. Martin Blinder, a general practice psychiatrist from San Francisco, testified defendant had a severe schizoid-avoidant disorder which made defendant think he would protect the world from the victim, who was the embodiment of evil, by killing him. If true, this conflicts with defendant's efforts to conceal the victim's body and to lie to deputies about the victim's whereabouts.
Dr. Blinder believed Dungeons and Dragons could be a catalyst that converts a "quiet" schizoid personality into someone who does what defendant did. The witness also believed it would be difficult to say if defendant knew right from wrong just from a clinical report, suggesting the jury should also consider defendant's other conduct including the planning, going to a secluded spot, telling a cover-up story to avoid being caught and involving a third party, Moseley, to keep him from talking about the killing.
Dr. Blinder also had the Millon exam administered to defendant. Graded by computer in Minnesota, the test reflects the words "questionable validity" on the top.
Dr. Blinder, however, opined the test was valid.
Additionally, Dr. Blinder stated defendant's conversation with Dr. Vigen about seeing a UFO could be an attempt to fool somebody. He was "skeptical" that over-the-counter pills could have caused hallucinations as defendant claimed.
Nonetheless, Dr. Blinder stated it was "not unusual" for a mentally ill person to plan a crime or to try to cover it up. To him, these facts indicated defendant was less mentally ill than some psychotics.
Dr. Joe Ben Hayes, another defense psychiatrist, who qualified as an expert in forensic psychiatry with experience in addictionology, testified he agreed with Drs. Vigen and Blinder's diagnosis that defendant had a severe schizoid-avoidant personality disorder. Additionally, Dr. Hayes found defendant to be suffering from a delusional disorder. Either diagnosis, he opined, constituted a mental disease or defect which rendered defendant incapable of distinguishing right from wrong and contributed to defendant's perception of Smith and ultimately to Smith's execution.
Kenneth Jones, a part-time volunteer coach at defendant's high school, testified that his son and defendant played Dungeons and Dragons for hours. He also described defendant's enjoyment of participating in paint gun wars. Mr. Jones said defendant never killed anyone in the Dungeon game, he would just disarm them. He believed defendant went "wacko" three days before the murder.
Defendant also presented brief testimony from two fellow high school students that he was withdrawn, he had "gone crazy," and that defendant was deeply involved in "Dungeons and Dragons."
The state, on the other hand, had shown during its case-in-chief that defendant had planned the murder because Smith had stolen a shotgun from him six days before the killing. Defendant had discussed with Moseley where and when to do the killing. After the victim was dead, defendant had a friend dispose of the .38 caliber pistol defendant used in the killing.
*1389 Several police officers testified that on the day of the killing and during the next few days of their investigation, the defendant appeared normal and did not appear to be suffering from any apparent mental disease or illness.
In the state's rebuttal, Dr. Seiden, a psychiatrist, testified there were several factors indicating defendant was malingering or feigning illness present in this case: lack of cooperation with the state's court-ordered psychological examination; presenting different versions of symptoms; presence of a nonpsychotic explanation (vengeance); and use of a partner in the crime. He testified it was highly unlikely for a sane person to cooperate with an insane killer who says, "It's OK because I'm the dungeon master."
Dr. Seiden further believed the MMPI results appeared manipulated. To him, the "obvious" questions showed illness, but the "subtle" questions, those a layman would not know to manipulate, showed normal scores. He particularly noted that a score of more than 165 on the Millon test performed by Dr. Blinder was evidence of malingering. Defendant's score was 281.
Dr. Seiden discussed at length his reasons for believing the defense experts' diagnosis of schizoid-avoidant personality was inappropriate. He stated there is nothing in a schizoid diagnosis that addresses one's ability to distinguish right from wrong.
Having reviewed all the evidence in the light most favorable to the prosecution, we find a rational trier of fact could have concluded that defendant failed to prove his insanity by a preponderance of the evidence. This assignment is without merit.

DECREE
Finding no manifest or reversible error, we affirm defendant's conviction and sentence.
AFFIRMED.

APPLICATION FOR REHEARING
Before NORRIS, LINDSAY, HIGHTOWER, VICTORY and STEWART, JJ.
Rehearing denied.
NOTES
[1] In brief, defense counsel specifically abandoned 47 other assignments he initially identified.
[2] Moseley's appeal was filed after the instant appeal. The decision has not yet been rendered. State v. Frank Dwayne Moseley, (No. 22,623-KA).
[3] The motion to suppress states in pertinent part:

[C]ertain medical information has been received by defense counsel ... [indicating defendant] is suffering from a severe mental illness ... [as a result of which] defendant was unable to intelligently waive his constitutional rights against self-incrimination due to his illness.
[4] Assignments 36 and 37 were not briefed or argued. Accordingly, they are deemed abandoned. Rule 2-12.4, URCA; State v. Schwartz, 354 So.2d 1332 (La.1978).